# Daniel & Wife *v.* Hill & Wife.

### *Bill in Equity to set aside Probate of Will.*

1. *Testamentary capacity as to personalty.* — Testamentary capacity as to personalty is governed by the law of the last domicil.

2. *Domicil of minor; how arises and changes.* — The domicil of the minor follows and changes with that of the parents, and if the father dies, his last domicil is that of the infant children.

3. *Same; guardian cannot change.* — The guardian cannot change the domicil acquired by the ward at the place of his birth, or derived from his father at his death.

4. *Same; testamentary capacity of ward; what law fixes.* — A ward whose parents died domiciled in Alabama, where letters of guardianship of his person and estate had been granted, does not lose or change his domicil here, because he accompanies his guardian, on his change of residence, to another State; and the ward dying testate in the latter State, his testamentary capacity must be measured by the laws of Alabama.

5. *Same; recital as to, not conclusive.* — A recital in a will that the testator is of a particular place, is never conclusive as to domicil, and may be rebutted by proof of the actual domicil.

6. *Will; essentials of.* — It is of the essence of a will that it be ambulatory and revocable in its nature during the life of the testator. An instrument possessing these characteristics, fairly apparent from the face of it, no matter how irregular in form or inartificial in expression, or by what name designated, must have effect as a will.

7. *Will; what instrument is.* — A written instrument was as follows: "Know all men by these presents, that I, R. D. M. . . . . do for the love I have for my uncle A. S. D., and my aunt M. A. D., if I do not live to be twenty-one years of age, I give to them all the money I have in the hands of my uncle A. S. D., who is my guardian, to have and to hold as theirs forever, their assigns, &c., the record

[Daniel v. Hill.]

of which is in the probate court of Greene county, Alabama. In witness whereof I have set my hand and seal, this March 10th, 1869. R. D. McAlpine. [L. S.]" It was properly attested by two witnesses : *Held*, a will, not a deed.

8. *Confidential relations between testator and legatee ; what imposes on proponent of will.* — The existence of confidential relations between the testator and legatee or devisee excites the suspicion and jealousy of the court, and casts upon the proponent of the will the duty of showing, by affirmative evidence, the testator's capacity, volition, and free agency.

9. *Same ; when will established, notwithstanding.* — When all suspicious circumstances are explained, all legitimate inferences of undue influence repelled, and all doubts and presumptions, generated from the confidential relation, cleared away by affirmative evidence, which satisfies the conscience of the court of the capacity of the testator, his knowledge of the contents of the will, and its expression of his spontaneous intentions, the will is valid ; and this, notwithstanding the confidential relations between the testator and the person drawing the will, who takes the principal or sole benefit under it.

10. *Same.* — In this case a will drawn by the guardian, and executed only in the presence of his immediate family, by which his nephew and ward bequeathed to the guardian and his wife all the ward's property then in the guardian's hands, in exclusion of a sister of the whole and one of the half blood, was sustained. The court reviewing at length the evidence, which clearly showed the testator's capacity, repelled all suspicion of undue influence, and established that the testator's disposition of his property was in accordance with the state of-his affections, and clearly expressed his spontaneous intentions.

11. *Chancellor's decree on facts ; when reversed.* — The chancellor's decree on controverted facts will not be disturbed unless it clearly appears that he has erred. When the decree is in opposition to material testimony not controverted, it cannot be allowed to stand ; the error then being not an error of fact, but as to the legal effect of facts not disputed.

APPEAL from Chancery Court of Greene.

Heard before Hon. A. W. DILLARD.

The bill in this case was filed by the appellees to set aside the probate of the will of Robert D. McAlpine. The appellee, Mary E. Hill, was the only sister of the full blood of the said Robert D., who died in March, 1869, between eighteen and nineteen years of age, unmarried, and leaving no brothers. After his death the appellant, A. S. Daniel, procured to be admitted to probate, in the court of probate in the county of Greene, an instrument in writing, as the last will and testament of the said Robert D., in the terms following : " Enterprise, Miss., March 10th, 1869. Know all men by these presents, that I, R. D. McAlpine, of the county of Clark, State of Miss., do for the love I have for my uncle A. S. Daniel, and my aunt M. A. Daniel, if I do not live to be twenty (21) one years of age, I give to them all the money I have in the hands of my uncle, A. S. Daniel, who is my guardian, to have and to hold as theirs forever, their assigns, &c., the record of which is in the probate office of Greene Co., Ala. In witness whereof I have set my hand and my seal, this March 10th, 1869.

"R. D. McALPINE. [Seal.

" Witnesses :

" M. E. Reinhardt.

" H. M. Etherington."

The material facts appearing in the record are : that the

[Daniel v. Hill.]

parents of Robert D. McAlpine died in 1857, leaving him an infant, but a few months old. Mrs. Daniel was his paternal aunt, and at the request of his parents, took the care and control of him. He remained under their roof, as a member of their family, receiving from them parental care and affection, recognizing them as his parents, until his death on the 30th of March, 1869. In 1857, A. S. Daniel was appointed by the court of probate of Greene county guardian of the person and estate of the said Robert D. In February, 1868, he made with said court his last annual settlement as such guardian, by which a balance exceeding $6,000 was ascertained to be due from him to his ward. The testator, Robert D., died of pulmonary consumption, and was sick for about four months prior to his death. For about six weeks before his death he was confined to his room, and the greater part, if not all the time, to his bed. At the execution of this testamentary paper he was very feeble and emaciated. The evidence of his testamentary capacity at that time and to his death, is full and uncontradicted. The will was written by A. S. Daniel, the guardian, in the room of the testator, when no one was present but his wife, the aunt of the testator, and other members of the family of the guardian. After the will was written, it was handed by Daniel to Mrs. Reinhardt, his sister, and one of the attesting witnesses, who having read it handed it to the testator, who read and then signed it, and it was attested by the subscribing witnesses.

The bill seeks to set aside the probate of the will, on allegations of fraud and undue influence practised in its procurement by Daniel and his wife ; and on the ground that the domicil of the testator, when the will was made, and at his death, was in the State of Mississippi, and the laws of that State did not confer upon him testamentary capacity. . The cause was heard on pleadings and proofs, and the chancellor being of opinion the allegations of undue influence were sustained, rendered a decree annulling the probate. From that decree this appeal is taken. The other facts of the case are reviewed in detail and at length in the opinion.

J. B. CLARK and T. C. CLARK, for appellant. — In *Barry* v. *Butlin* (1 Curtis' Ecclesiastical Reports), Lord BROUGHAM lays down the rule that the *onus probandi* lies upon the party propounding the will ; and he must satisfy the court that it is the spontaneous act of a free and capable testator. If the party writes or propounds a will under which he takes a benefit, this engenders suspicion and distrust, calling on the court to be vigilant and jealous in examining the evidence in support of the will, and if this is sufficient to satisfy the conscience of the court and remove the suspicion, the will must stand.

[Daniel v. Hill.]

The presumption against the will does not become conclusive because the will was written by the sole legatee who was guardian of the testator. *Durling & Parker* v. *Loveland*, 7 Ecclesiastical Reports, 92; *Potter* v. *Allison*, 7 Humphreys, 325; *Downey* v. *Murphy*, 1 Dev. & Bat. (Law) 82; *Hill* v. *Boyd*, 12 Ala. 694. The fact that a will is made in conformity to a fixed determination is strong evidence of capacity. *Couch* v. *Couch*, 7 Ala. 524. The making of the will cannot be assimilated to the making of contracts or the passing of gifts between *cestuis que trust* and trustee. *Lampert* v. *Lampert*, 1 Vesey Jr. 20. The influence and control acquired over others, the sole result of acts of kindness, the natural deference given to manly character, the feeling of affection which springs from association with the upright and lovable, cannot constitute undue influence. *Hall* v. *Hall*. 38 Ala. 131; *Gilbert* v. *Gilbert*, 22 Ala. 532; *Leveretts* v. *Carlisle*, 19 Ala. 80; Williams on Ex'rs, 39.

The facts of this case acquit appellants of all suspicion. They present the case of a will made in pursuance of a long expressed intention, at a time when the intellect was clear, in accordance with the dictates of affection, reason, and justice. They show that the will was read to the testator and adopted by him. The kindred who did not share in the disposition of his property were not lost sight of, but the testator deemed it just that they should not share his bounty. To whom better could he leave his property, soon to be of no value to him, than to appellants? They took him while a helpless infant and reared him almost to manhood. With unwavering affection they sheltered him through life, and with unselfish love watched him as a child of their own, soothing his last hours with parental kindness. Where better could the grateful heart of the youth bestow, what was no longer of value to him? Where else should his love and affection have rested? A careful scrutiny of the circumstances attending the making of the instrument will show that it was the free, intelligent choice of an unclouded intellect, disposing of property, in accordance with a long intended purpose, to those whose influence over him was born of no acts save of unwavering affection and parental kindness. Cases less strong than this have been upheld by the highest court of England. *Arnold* v. *Earle*, 6 Ecclesiastical Reports, 230.

SNEDICOR & COCKRELL, and CHARLES COOKE, *contra.* — The question is not whether the chancellor's decree is right, but whether it is *manifestly* wrong. 45 Ala. 415; 46 Ala. 318; 39 Ala. 63; 30 Miss. 313. The burden is on appellants to how the validity of the will; a double burden when the

guardian writes it, he being the sole sharer in the bounty of his ward. Suspicion and distrust are engendered by such transactions. The ground on which a court of equity proceeds in condemning such acts is "not on the ground of positive fraud, but from motives of general public policy." *Meek & Thornton* v. *Perry*, 36 Miss. 190. The general doctrine is that " a court of equity will, upon grounds of public policy, set aside any gift made by a ward to his guardian during the continuance of the relation, or shortly thereafter, without any proof of actual fraud, *upon the presumption* that it was obtained by undue influence." *Ingram* v. *Wyatt*, 1 Haggard, 384; *Wells* v. *Middleton*, 1 Cox, 112; *Hylton* v. *Hylton*, 2 Vesey Sr. 547; 9 Vesey, 295; 3 Mylne & Keen, 113; Kerr on Frauds, 177; 2 Leigh, 11. The only modification of the rule here is that this presumption *is not conclusive;* but strong testimony must be produced to countervail it. 5 Vesey, 678; 5 Ala. 90. The general doctrine is that all such contracts, whether by deed or will, are void unless the *bona fides* is shown by the most powerful evidence. *Breed* v. *Pratt*, 18 Pickering, 115, per SHAW, C. J.; *Meek & Thornton* v. *Perry*, 26 Miss. 252; *Morris et ux.* v. *Stokes*, 21 Ga. 552. That the general doctrine of the incapacity of the ward to contract with the guardian is applicable in all its force to a will, is fully settled and put at rest in this country. *Morris et ux.* v. *Stokes*, 21 Ga. 575; *Breed* v. *Pratt*, 18 Pick. 115; *Meek & Thornton* v. *Perry*, 36 Miss. 252; *Ingram* v. *Wyatt, supra ; Pattison* v. *Allison*, 7 Humph. (Tenn.) 334. *McCartney* v. *Bone & Wife*, 33 Ala. 601; 37 Ala. 556; 31 Ala. 304. See also as peculiarly in point 12 Ala. 694; 5 Ala. 90; Ib. 81. By the removal of the ward *and* his estate the domicil of the ward was changed. 5 Pickering, 26; 18 Ga. 5; 2 Kent's Commentaries, 227, note C; Rev. Code, § 2441. The instrument sought to be probated is not a *will*, but a *deed*. The words are appropriate to convey a present interest. This interest is to be " defeated " only by one contingency, the living of the grantor until he is twenty-one years of age. There is the absence of a single expression imparting to the instrument a " testamentary " character, and all comport with a deed. " To have and to hold " are words of testamentary disposition, and the instrument conveys or passes money on hand designated as *then* being in the hands of the guardian. These characteristics distinguish it from *Gilham* v. *Mustin*, 42 Ala. 365. The recital in the will as to residence estops the legatees. 8 Ala. 543; Bigelow on Estoppel, 297. The evidence shows a studious concealment about the making of the will, and systematic attempts to remove and cut off the ward from the intercourse and influence of his nearest relatives. The circumstances attending the

execution of the will, the character of the witnesses to it, the near friends and kindred not being present, all show a disposition to shut out the testator from the presence and counsel of impartial and disinterested friends and advisers. The testator was weak in body and feeble in intellect. The evidence clearly establishes that the will was obtained by undue influence. To say the least of it, it is entirely insufficient to rebut the presumption which the law is compelled to draw from the facts.

BRICKELL, C. J. — It certainly is now a settled principle prevailing in this country, without exception so far as we can ascertain, that testamentary capacity, as to personalty, is governed by the law of the last domicil; as to realty, by the *lex rei sitœ*. Whart. Con. Laws, § 568; Story's Con. Laws, § 465; *Varner* v. *Bevil*, 17 Ala. 286. The important rules which are generally adopted as guides in determining the domicil, when it is in doubt, are thus stated by Judge STORY : "First, the place of birth of a person is considered as his domicil, if it is at the time of his birth the domicil of his parents. Secondly, the domicil of birth of minors continues until they have obtained a new domicil. Thirdly, minors are generally deemed incapable *proprio marte* of changing the domicil during their minority, and therefore they retain the domicil of parents; and if the parents change their domicil, that of the infant children follows it; and if the father dies, his last domicil is that of the infant children." Story's Con. Laws, § 46. It is settled in this court that a guardian cannot change the domicil taken by his ward at the place of his birth, or acquired from the father at his death. *Johnson* v. *Copeland*, 35 Ala. 521. The testator was born in this State; his parents had their last domicil here, and guardianship of his person and estate were granted by a court of this State. Though he accompanied his guardian to Mississippi, on his change of residence to that State, he retained the domicil of his birth, and his testamentary capacity must be measured by the law of this State. The recital in the will, that the testator is of "Clark county, Mississippi," does not estop the appellants from showing his domicil was in Alabama. Such a recital is never conclusive, but may always be rebutted by proof of actual domicil. Whart. Con. Laws, § 61; *Gilman* v. *Gilman*, 52 Me. 177; *Whicker* v. *Hume*, 5 Eng. Law & Eq. 52.

There is much contrariety of statement among common law writers as to the age at which persons were capable of disposing of personal estate by will. Lord COKE states the age to be eighteen, others seventeen. There are *dicta* of chancellors that fifteen is the age for males, if sufficient discretion appears;

[Daniel v. Hill.]

and some have doubted if twenty-one was not the earliest period. Modern Probate Wills, 15. Modern writers generally, conforming to the rule of the civil law, state that males of fourteen, and females of twelve, had testamentary capacity as to personal estate. Redf. on Wills, 15 ; 1 Jarm. on Wills, 29 ; 1 Williams on Ex'rs, 14. The tendency of recent legislation, in England and in this country, has been by statute to prescribe the age. The statute of this State, not distinguishing between males and females, prescribes twenty-one as the age at which capacity to devise real estate shall be imputed ; and eighteen as the age at which personal property may be bequeathed. R. C. §§ 1910–1916. Whether a will disposes of real or personal property, it must be signed by the testator, or some person in his presence and by his direction, and attested by at least two witnesses, who must subscribe their names thereto in the presence of the testator. R. C. § 1930.

The instrument propounded as the will of the testator was signed by him after he had attained the age of eighteen years, and was attested by two witnesses as the statute requires. It is argued the instrument is a deed and not a will. A will is defined to be an instrument by which a person makes a disposition of his property to take effect after his decease, and which is, *in its own nature*, ambulatory and revocable during his life. It is this ambulatory and revocable quality which forms the characteristics of a will. True, a deed or other instrument may postpone the possession, or the enjoyment, or the vesting, and may not, therefore, be fully effectual until the death of the grantor or the maker ; but this is the force of its express terms, and does not result from the legal nature of the instrument. A deed may be so framed that the grantor reserves to himself use and possession during his life, and on his death create a remainder in fee in a stranger. Immediately on the delivery of the deed, the remainder vests in title, and is postponed only in enjoyment. A devise to the stranger would create no interest whatever until the death of the testator. The remainder created by the deed would be irrevocable by the grantor, and by no subsequent grant or conveyance could he defeat it. The devise is revocable at the pleasure of the devisor ; and is revoked by a subsequent grant or devise to another. 1 Jarm. on Wills, 13. It is not requisite to the validity of a will that it should assume any particular form, or that it should be couched in language technically appropriate to its testamentary character. However irregular in form or inartificial in expression it may be, if it discloses fairly the intention, that the destination of the property on which it operates is posthumous only, it is not material what title or designation may be given it. 1 Jarm. on Wills, 14. Instruments entitled deeds-poll, or indentures,

[Daniel v. Hill.]

or articles of agreement, which substantially made testamen-
tary dispositions, have often been deemed wills only, of which
probate was necessary to their operation.   This instrument
purports to be sealed, and bears rather the form of a deed, but
in its language has no words of grant or conveyance.   Its words
are of gift only, expressing a disposition of personal property
to take effect in the event of death before the testator arrives
at the age of twenty-one years.   The death of the testator
alone can operate to create any interest in the donee, and it is
of consequence a will.   *Dunn* v. *Bank of Mobile*, 2 Ala. 152;
*Shepherd* v. *Nabors*, 6 Ala. 631; *Gilham* v. *Mustin*, 42 Ala.
365.

   The capacity of the testator is not impeached.   Though he
was in declining health, and lingered under the disease from
which he was suffering when the will was made until his
death, twenty days thereafter, his intellect does not appear to
have been at any time clouded or enfeebled.   In ordinary
cases, testamentary capacity not being doubtful, it is not neces-
sary for the proponent, in the first instance, to offer evidence
of the testator's knowledge of the contents of the will.   This
is inferred from publication and execution.   *Hill* v. *Barge*, 12
Ala. 687; 1 Jarm. on Wills, 47; Shelford on Lunatics, 421;
*Carr* v. *McCasum*, 1 Dev. & Bat. (Law) 276; *McNinch* v.
*Charles*, 2 Pick. 229.   The legal presumption in such cases is
always in favor of the will; and he who seeks to impeach it
must clearly show that the testator was imposed on, or that
there was some mistake whereby he was deceived.   *Day* v.
*Day*, 2 Green's Ch. (N. J.) 549; *Pevus* v. *Bingham*, 10 N.
H. 514.   When the will is written, or procured to be written,
by a person who is a principal beneficiary under it, and who
stands in a confidential relation to the testator, favorable to the
exercise of undue influence, the presumption and *onus probandi*
are against the instrument, and he must satisfy the conscience
of the court that the testator had knowledge of the contents
of the will, and voluntarily executed it.   *Hill* v. *Barge, supra;*
1 Williams on Ex'rs, 91; 1 Jarm. on Wills, 42–45; Shelford
on Lunatics, 414; *Raworth* v. *Mariott*, 1 Mylne & Keen, 643
(7 Eng. Ch. 205); *Ingram* v. *Wyatt*, 3 Eng. Ecc. 166; *Wrench*
v. *Murray*, 7 Ib. 525; *Butlin* v. *Barry*, 6 Ib. 406.

   This will was written by Daniel, and he and his wife are its
only beneficiaries.   He was the guardian of the testator, who,
from early infancy an orphan, had been reared and lived under
his roof, as a member of his family.   The will was written and
executed in the testator's last illness, but twenty days before
his death, when recovery was doubtful, if not hopeless.   Its
execution was in the presence only of the family of Daniel, and
when the testator had not access to, or intercourse with the re-

lations who, by law, would have succeeded to his estate.  These
are all facts militating against the fairness and validity of the
will, exciting the jealousy and vigilance of the court, and re-
quiring clear and satisfactory evidence of capacity, volition,
and that the testator knew the contents of the will.  1 Wms.
Ex'rs, 96 ; 1 Jarm. on Wills, 42–47.

By the civil law, if a person wrote a will in his own favor,
the instrument was rendered void, in conformity to an ordi-
nance under Claudius, that the writer of another's will should
not mark down a legacy to himself.  *Vreeland* v. *McClelland*,
1 Brad. Sur. Rep. 420.  No such rule prevails in the English
ecclesiastical courts, from which we have borrowed the general
principles determining the validity of wills of personal property.
In such case, these courts have asserted only that evidence of
publication and execution will not authorize probate, as it will
when the capacity is not doubtful, and the opportunity afforded
for imposition, by the writing of the will by one taking a ben-
efit under it, does not exist; or when there are not circum-
stances of suspicion against the fairness of the will developed
by evidence.  *Ingram* v. *Wyatt, supra ; Butlin* v. *Barry, supra ;
Raworth* v. *Mariott, supra ; Hill* v. *Barge, supra.*  In the
case of *Barry* v. *Butlin, supra,* on appeal to the privy council,
Baron PARKE carefully and critically examined the decisions
in the ecclesiastical courts, and says :  " The rules of law, ac-
cording to which cases of this nature are to be decided, do not
admit of any dispute, so far as they are necessary to the deter-
mination of the present appeal ; and they have been acquiesced
in on both sides.  These rules are two : the first, that the *onus
probandi* lies in every case upon the party propounding a will ;
and he must satisfy the conscience of the court that the in-
strument so propounded is the last will of a free and capable
testator.

" The second is, that if a party writes or prepares a will
under which he takes a benefit, that is a circumstance which
ought generally to excite the suspicion of the court, and call
upon it to be vigilant and jealous in examining the evidence in
support of the instrument, in favor of which it ought not to
pronounce unless the suspicion is removed, and it is judicially
satisfied that the paper propounded does express the true will
of the deceased."  Again : " All that can be truly said is, that
if a person, whether attorney or not, prepares a will with a
legacy to himself, it is, at most, a suspicious circumstance of
more or less weight, according to the facts of each particular
case ; in some of no weight at all, as in the case suggested,
varying according to circumstances ; for instance, the *quantum*
of the legacy, and the proportion it bears to the property dis-
posed of, and numerous other contingencies ; but in no case

[Daniel v. Hill.]

amounting to more than a circumstance of suspicion demand-
ing the vigilant care and circumspection of the court in inves-
tigating the case, and calling upon it not to grant probate
without full and entire satisfaction that the instrument did ex-
press the real intention of the deceased. Nor can it be neces-
sary that, *in all such cases*, even if the · testator's capacity is
doubtful, the precise species of evidence of the deceased's
knowledge of the will is to be in the shape of instructions for,
or reading over, the instrument. They form, no doubt, the
*most* satisfactory, but they are not the *only* satisfactory de-
scription of proof by which the cognizance of the contents of
the will may be brought home to the deceased. The court
would naturally look for such evidence; in some cases it might
be impossible to establish a will without it, but it has no right
in every case to require it." In *Raworth* v. *Mariott, supra*, it
is said : It must not be understood that *direct* evidence of the
testator's knowledge of the contents of the will is necessary ;
circumstantial evidence may be sufficient for that purpose. In
*Durling* v. *Loveland*, 2 Curtis, 225 (7 Eng. Ecc. Rep. 92),
the court reviewing the judgment of Baron Parke, in *Butlin*
v. *Barry, supra*, pronounces as the rule on which the ecclesi-
astical court has proceeded, when a will is drawn by a person
standing in a confidential relation to the testator, who takes a
considerable benefit under it, that it is not necessary to prove
the will was read over to the testator, or instructions given
for its drawing, but that the court must be satisfied the will
expresses the real intentions of the testator. The authorities
in this country assert the same doctrine. Affirmative evidence,
in any legal mode, that the will expresses the spontaneous in-
tentions of the testator, satisfies the court, and removes the un-
favorable presumptions which would otherwise be indulged.
*Crispell* v. *Du Bois*, 4 Barb. 393 ; *Downey* v. *Murphey*, 2 Dev.
& Bat. 82; *Patton* v. *Allison*, 7 Humph. 320.

The evidence in the record, without conflict, traces the his-
tory of the testator from his birth to his death. His parents
died in 1851, when he was about six months of age, and they
committed him to the care of Mrs. Daniel, the sister of his
father, who was childless. His only immediate relatives were
a sister of the whole and one of the half blood. These were
older than he, and orphanage estranged them from all but
mere casual intercourse. They do not appear ever to have re-
sided under the same roof, or to have been members of the
same household. It is not strange then that he never mani-
fested for either of them the affection he would have borne to
the sisters who had shared with him a common parental care
and love. The uncle and aunt to whom his dying parents in-
trusted him in infancy watched over him, and bestowed upon

him the care and affection they would have given to the child of their marriage; and he repaid it with filial obedience and love. The one he spoke of as his father, never applying to him any other name; to the other he gave the childish yet endearing appellation of *Niny.* To his grandmother, — perhaps the last time he saw her, for they seem to have resided some distance from each other, — a year or two before his death, he speaks of the unvarying kindness and affection of his uncle and aunt, the only parents he had ever known, and declares if he should live to be a man they should never want for anything. To the witness Roberts he declared several times before his last illness, and when his health was not good, that in the event of his death he wished *his Pa and Niny should have his property ;* and when reminded of his sister, the appellee Mrs. Hill, said, *she had drawn her part, and had a husband to take care of her,* — meaning, as we suppose, that she had shared equally with him in an inheritance from their parents. The will, on undisputed evidence, is then in consonance with the state of his affections, and in conformity to the only testamentary declarations he is proved ever to have made. If the pecuniary condition of his sisters was such as to have appealed directly to his sympathies, or to have excited his benevolence, no evidence of the fact is given, nor that he had knowledge of it. Apart from all evidence of his testamentary declarations, it would naturally be expected that the uncle and the aunt, who had stood from his infancy in the relation of father and mother to him, whose kindness and affection knew no varying or change, would be the recipients of his bounty, rather than the sisters with whom he had never been associated.

The will is drawn at his solicitation, is read over to him, and handed to him to read, and is signed by him, while able to sit up in his bed, and at his request is attested by two witnesses in his presence. These facts certainly furnish all the evidence, that the most jealous and vigilant court could demand, that the will expresses the spontaneous intentions of the testator, and that he had full knowledge of its contents. Whatever unfavorable presumptions could be drawn from the fact that the writer and his wife are the sole beneficiaries, and that the will was written and executed in the presence only of members of his family, are all repelled. Much stress is laid in the argument of counsel on the fact that the will was witnessed only by members of Daniel's family. If the capacity of the testator was doubtful, if there was any evidence of concealment or secrecy about the transaction, if he had resided so long at the place where the will was made as to have formed an intimate acquaintanceship without the family circle, the fact would be of more importance. But in no event could it be regarded as

Vol. lii.

[Daniel v. Hill.]

important, when confronted with such clear and undisputed evidence of capacity and spontaneity as the proponent has introduced, and which is not controverted.

It is also insisted that proper medical attention was not furnished the testator. The evidence does not support the accusation; and it seems to us rather harsh, if not cruel, when the boy's whole life had been marked by the care of the uncle and aunt, which he never failed to acknowledge dutifully and affectionately, and when his corpse was borne from her roof, she was writhing in convulsions of grief, endangering her own life.

It is said there was a studied effort to cut the testator off from communication with his nearest relations before and after the execution of the will. The evidence does not lead us to this conclusion. That Mrs. Daniel advised her brother, the uncle of the testator (residing near the sister, Mrs. Hill) of the testator's illness, is distinctly proved. The grandmother says that Mrs. Hill was informed of it. Whether she was or not, the fact of the communication repels the accusation of a studied effort to conceal his illness. The testator was sick for four months, during all which period the sisters make no inquiries for him or about him. It is not matter of reproach to them, but the fact is significant of the character of intercourse existing between them.

It is again urged that the ward's whole estate consisted of moneys in the hands of Daniel amounting to more than six thousand dollars, that he was looking in dread to the testator's maturity, as the day of settlement; and that he had therefore a strong motive to procure the will, which would operate as a release from liability. The weight of this fact has not been overlooked. Daniel was appointed guardian in 1857, when the ward was about six years of age. The entire estate of the ward consisted of money amounting in February, 1859, on the first annual settlement, to about forty-four hundred and seventy dollars. Regular annual settlements are made by the guardian to February, 1869, when we find the ward has been supported and educated and his patrimony increased to six thousand two hundred and sixty dollars. These settlements bear internal and conclusive evidence that the guardian honestly and faithfully has discharged his duty in the management and improvement of the ward's estate. It is unfortunately too often true, that a ward's patrimony, if not larger than this, diminishes rather than increases in the hands of guardians; the expenses of maintenance and education exceeding the income, and trenching gradually on the capital. It does not appear that Daniel would have been at all embarrassed by meeting this liability on his ward's maturity, and he certainly never avoided, promptly and annually to place on the records of the proper

court clear and conclusive evidence of its extent. Is it fair or just, is it charitable or lawful, in the face of these facts, and of the convincing evidence that he had never faltered in his affection for the testator, to indulge the presumption that, to avoid this liability he, by force or by fraud, extorted this will? When we say force, of course we mean only the moral coercion which the law denominates undue influence. We feel assured that the history of his guardianship as it is written in this record, and of his connection with the testator as it is disclosed by the evidence, acquits him of the suspicion.

It is most ably argued, that although the evidence may establish capacity, and may not establish fraud or undue influence in the procurement of the will, so clearly that its validity could be questioned, if no confidential relation had existed between the testator and the beneficiaries, yet its probate should be annulled, upon the general doctrine that courts of equity adopt on principles of public policy, in reference to all gifts made to or contracts made with a guardian, during the continuance of the guardianship. The principle is fully recognized, and the importance of a rigid adherence to it properly appreciated. It cannot be applied in its full force to testamentary donations, though in these demanding from the court vigilance, and from the donees clear evidence of the capacity of the donor, of spontaneity and free agency in the execution of the gift. A testamentary donation not taking effect until the death of the testator, until he is incapable of the use and enjoyment of the subject of the gift, and it must devolve in title, use, and enjoyment to another, either by his disposition or operation of law, the reason of the principle does not fully exist. It may be just and proper for him to give, and fair and honorable for the donee, in that event, to accept benefits which could not in life have been prudently dispensed, or in good faith received. Whatever may be his condition in life, a just father would not permit a son, just entering manhood, to strip himself of his fortune, and become the recipient of it. Yet if the son were dying, it might be his highest moral duty to bestow his fortune on the father, and the father, without the imputation of selfishness, could accept it. So, if a ward just reaching emancipation should materially diminish his fortune by a gift to his guardian, the transaction would *primâ facie* import folly on the one hand and fraud on the other. But if the ward were dying, and his property ceasing to be of value to him, except in his power of disposition, he should make a testamentary donation to his guardian of a part or the whole of his estate, because of the guardian's kind offices in the helplessness of his infancy and childhood, and no improper influence has been exerted, who can say that the ward should not give, nor the guardian re-

[Daniel v. Hill.]

ceive? Whatever may be said of the wills of worldlings, whom avarice has hardened, or age chilled, the will of a generous youth is the offspring of his affections, and when these have not been practised upon it should be sustained. 3 Lead. Cases in Eq. 145, top p. That he may have the capacity of gratifying them, the law confers testamentary power over his personal estate.

The cases have gone very far in sustaining testamentary donations, when made to persons sustaining confidential relations to the testator, even when suspicious circumstances attended the transaction, and there was a deficiency of capacity. It would serve no good purpose to review them; they are generally cited in the recent writers on wills, though to some of them we will refer. In *Arnold* v. *Earl* (6 Eng. Ecc. 230), a will made by a minor of sixteen in favor of his guardian and schoolmaster, in whose house he lived, was substantiated. The will in the case of *Butlin* v. *Barry*, *supra*, was drawn by a solicitor, taking a considerable legacy, and legacies given to a medical man and brother of the deceased, to the exclusion of an only son. It was sustained on proof of capacity and knowledge of contents. In the case of *Crispell* v. *Du Bois*, *supra*, the will was drawn by the physician and confidential adviser of the testatrix, who was sixty years of age. He was a principal beneficiary, and her heirs were excluded. On proof of capacity and volition, and of unfriendly relations with her heirs, it was admitted to probate. In *Wyatt* v. *Ingram* (3 Hagg. 466; 5 Eng. Ecc. 183), a will of a testator of seventy-four years of age, drawn by the father of his attorney and agent, who was appointed executor, and almost universal legatee, and with whom the testator lived, was supported, — all unfavorable presumptions arising from the facts being rebutted and the capacity of the testator established. These authorities rest on the principle already announced, that the existence of confidential relations between the testator and legatee or devisee excites the vigilance and jealousy of the court, and casts on the proponent of the will the duty of showing by affirmative evidence the testator's capacity, volition, and free agency. When these appear the will must be supported.

We have examined with care the two cases, *Morris* v. *Stokes* (21 Geo. 552), *Meek & Thornton* v. *Perry* (36 Miss. 190), to which the counsel for appellees have referred. In each are features to be found not existing in the case now before the court, and which may have justified the conclusions reached. In the former case, the guardian had indulged the ward in reckless extravagance, in gross violation of his duty as a guardian, and thereby induced, as was supposed, the bequests to himself. This case and that have no features in

[Chambers v. Wright.]

common. In the latter case, the guardian and uncle of the testatrix, her principal legatee, entertained an unreasoning prejudice and an unmanly enmity to the testatrix's sister, which he had instilled, or endeavored to instil into the mind of the testatrix, and had made the continuance of his favor and affection depend on her participation in it. The pecuniary condition of the disinherited sister was such as to demand sympathy and relief, and the two sisters had been reared together, and were connected in associations and memory. No such facts exist in this case; and while we regard the law as correctly stated in the dissenting opinion of HANDY, J., and not in the opinion of the majority of the court, that case is so clearly distinguishable from this in its facts that it does not affect the conclusion we have reached.

The decree of the chancellor vacating the probate of the will is erroneous. There is no conflict in the evidence. The undisputed facts support the validity of the will. While we have announced our concurrence in the rule prevailing in this court that the decree of the chancellor on controverted facts will not be disturbed, unless it appears clearly that he has erred; when the decree is in direct opposition to the material testimony, which is not controverted, it cannot be allowed to stand. The error is then not an error of fact, but in the legal effect of facts not disputed. *Leeper* v. *Taylor*, 47 Ala. 221.

The decree of the chancellor is reversed, and a decree is here rendered dismissing appellees' bill, and they must pay the costs in this court and the court of chancery.