## Staunton.

## COOPER'S ADM'R. V. COMMONWEALTH.

September 20, 1917.

1. DOMICIL—*Residence—Meaning of the Terms—Statutes—Construction.*—Though frequently so used, "residence" and "domicil" are not synonymous words and *domicil* has the larger significance. The meaning of the word *residence* depends upon the subject matter and connection in which it is used. In general terms it may be said to be the dwelling place of a person, but it may be either his permanent or temporary abode. In the construction of statutes, the meaning of the word *residence* depends upon the context and purpose of the statute. As used in one statute it may clearly refer to a mere business residence, while as used in another it may just as clearly refer to domicil as technically and strictly defined. In determining the meaning of the word in a particular statute, the legislative purpose and the context must be always kept in view.

2. TAXATION—*Residing Therein—Meaning of the Term.*—As used in the Virginia statutes (Code, secs. 491 and 494, as amended Acts, 1915, p. 219), so far as they relate to taxes upon intangible property, having no other *situs* for taxation, the words "residing therein" and the words "residing * * * in his district" can only refer to persons domiciled in the district of the local commissioner of the revenue who makes the assessment, for any other construction would inevitably lead to hopeless confusion and conflict between the different communities in this and in other States, in which the taxpayer might have temporary residences, as well as to multiplied taxation upon the same property.

3. DOMICIL — *Definition — Change of Domicil — Presumptions and Burden of Proof.*—Residence, with no present intention of removal, constitutes domicil. Mere change of place is not change of domicil. Mere absence from a fixed home, however long continued, cannot work the change. There must be the *animus* to change the prior domicil for another. To constitute a new domicil two things must concur—first, residence in the new locality; second, the intention to remain there. Until the new

domicil is acquired, the old one remains and whenever a change of domicil is alleged, the burden rests upon the party alleging it.

4. DOMICIL—*Presumptions and Burden of Proof.*—It being established that from his childhood to 1905 a person's domicil was in another State, the burden is upon those who allege change of domicil to establish it.

5. DOMICIL—*Evidence—Voting.*—In doubtful cases particular significance should be attached to the repeated exercise of the right to vote, because this right depends upon citizenship and domicil, and must be generally, if not universally, supported by the oath of the voter.

6. DOMICIL—*Case at Bar.*—Notwithstanding that a party had lived for seven years in Salem, Virginia; that he had built and, with his family, occupied a handsome dwelling in that town; that he had been an officer and stockholder in a number of Virginia corporations; that in applications for life insurance policies and in certificates to procure charters for corporations, he had stated his residence to be in Salem; that he had become president of the board of trade of Salem; that he had transferred his church membership to a church in Salem; that his children went to the public schools of Salem without the payment of fees required of non-residents, though there was no evidence that he had ever been asked or refused to pay such fees; and that he had purchased burial lots in a cemetery in Salem and removed the bodies of two of his dead children and interred them in these lots; his domicil was in West Virginia, where he had resided prior to his removal to Salem; where the evidence showed that when the subject was discussed, he plainly made it evident that he did not intend to give up his legal domicil in West Virginia; that his chief business and largest property interests were there; that he was postmaster there and apparently desired to continue to hold that office, which he felt he could not do if he changed his domicil; that when asked by the commissioner of revenue of Salem to list his intangible property, he refused to do so and distinctly tendered the issue of fact which is involved to the commissioner of the revenue; that it was his custom to go to West Virginia and remain two or three days, every ten days or two weeks, for the purpose of attending to his business; that he paid his poll tax annually in West Virginia, and voted regularly in that State.

Application under sections 567 and 571 of the Code for the correction and cancellation of tax assessments. Judgment for the Commonwealth. Applicant assigns error.

*Reversed.*

The opinion states the case.

*Jackson, Henson & Saul* and *Jos. M. Sanders,* for the plaintiff in error.

*Attorney-General Jno. Garland Pollard, Assistant Attorney-General Leslie C. Garnett, J. D. Logan, R. T. Hubard,* and *Kime & Kime,* for the defendant in error.

PRENTIS, J., delivered the opinion of the court.

The question in this case is whether or not the intangible property of the estate of Thomas H. Cooper, deceased, is liable to taxation by the Commonwealth of Virginia, the county of Roanoke, school district No. 5 of Roanoke county, and the town of Salem, and depends upon whether his domicil for several years before his death was at Salem, Roanoke county, Virginia, or at Cooper's, Mercer county, West Virginia. The assessments having been made in 1915 for the years 1908 to 1915 inclusive, C. L. Hatcher, sheriff of Roanoke county and as such administrator of the decedent, alleging that such assessments are erroneous, applied under sections 567 and 571 of the Code for their correction and cancellation.

By consent and for convenience the motions were heard together and a single judgment entered. The trial court being of the opinion that Cooper was, within the meaning of the tax laws, a resident of Virginia from 1905 until his death, held the appellant liable for all the taxes assessed in favor of the Commonwealth, and pursuant to the statute

(Acts, 1916, p. 827, construed in *Commonwealth* v. *United Cigarette Machine Co.,* 120 Va. 835, 92 S. E. 901), relieved him from all local taxes prior to the year 1912, but held him liable for such local taxes for the years 1912 to 1915, inclusive.

The facts are, that Thomas H. Cooper, who had been domiciled in West Virginia since his childhood, in 1904 brought his wife and children to the town of Salem. He there bought twelve acres of land and erected a valuable dwelling thereon, the cost of which was variously estimated, but which was assessed for taxation in 1915 at $32,-000, and its market value is estimated to be between $50,-000 and $60,000. He with his family occupied this dwelling from its completion until March, 1911, when he died. When he first went to Salem and on every other occasion when the matter was referred to, he averred that his residence there was only temporary; that he came for the purpose of educating his children; and that he proposed to retain his domicil and citizenship in the State of West Virginia and to return to his home there when his purpose was accomplished. During all of this period he paid his poll tax annually in West Virginia, and voted regularly at Cooper's in that State. At the time he came to Virginia and to the end of 1909, as certified in the bill of exceptions, he was postmaster at Coaldale, a mining village two or three miles from Cooper's, and he was his father's administrator in West Virginia. He was the general manager of the McDowell Coal and Coke Co., and of the Coaldale Coal and Coke Co., and president of the Mill Creek Coal and Coke Co. He was a director of the Bank of Bramwell, W. Va., and of the Fidelity Bank and Trust Co. of Bluefield, W. Va., all of which positions he held up to the date of his death. As an officer of the coal companies above mentioned, he actively managed their business, which was large, received a salary therefor, and his habit was to go to West Virginia

and remain two or three days, every ten days or two weeks, for the purpose of attending to his business there. He reserved a room, which he called his own, in a house on the property of one of these companies at Cooper's, which was occupied by his mother. A very large part of his estate was invested in the stock of these coal mining companies. When he first came to Virginia the commissioner of the revenue at Salem proposed to assess him for capitation tax and demanded that he list his intangible property for taxation, for he was known to be well to do, but he denied his liability therefor, claiming that he was not domiciled in the State of Virginia, did not propose to change his domicil from West Virginia, and stated that he was postmaster at Coaldale and required by the Federal government to maintain a residence there; and, therefore, he only listed his tangible personal property in Salem for taxation. Each year thereafter when the tax interrogatories were presented to him, he erased all those portions thereof which would indicate that he was domiciled in Virginia, and always refused to list or pay any capitation or intangible property tax in Virginia, but he annually listed and paid taxes on his household furniture and other tangible property in Salem. Shortly after his death, his widow, on March 29, 1911, by a writing filed in the county clerk's office of Mercer county, W. Va., waived her right to qualify there as administratrix of her husband's estate, requested that his brother, Edward Cooper, be appointed his administrator, and upon her motion he was appointed. Edward Cooper took immediate charge of all of his estate, some of the securities being in a safe deposit vault in Salem, and some in a West Virginia bank, and has proceeded to administer his estate under that appointment. Four years thereafter, in 1915, by an order of the Circuit Court of Roanoke county, Virginia, Cooper's estate was committed to C. L. Hatcher, sheriff of Roanoke county, the appellant

here, and thereafter in 1915 the assessments complained of, $180,000 of intangible property and $25,000 income, for the years 1908 to 1915, inclusive, were made. The Virginia administrator testified that no property has come into his hands as such administrator, and that he knows of none within the State of Virginia which will come into his possession to be administered.

To justify the assessments these facts are relied on: That the decedent, Cooper, was a student at Roanoke College, Salem, Virginia, and married a resident of that town. Of the marriage six children were born, five while they were in West Virginia, and one after their return to Salem. He did not own any residence in West Virginia, but while there occupied one owned by one of the coal companies with which he was connected. When he came to Salem, he brought his household furniture with him. While there he became a stockholder in the Farmers' National Bank of Salem, a stockolder and officer in the Colonial Bank of Roanoke, a stockholder, director and president of the Catawba Valley Railway and Mining Co., extending about six miles from Salem, stockholder and official of the Cooper Silica and Glass Co., Inc., and of the Consumers Fuel Co., Inc., the last four being Virginia corporations. While in Salem he signed three certificates for the purpose of procuring three separate charters in the State of Virginia, in each of which his place of residence was stated to be Salem, Va. In 1909 he procured two life insurance policies, and in each of his applications therefor answered questions stating that Salem, Va., was his residence and business address. Upon application to the Secretary of the Commonwealth of Virginia for his automobile licenses in 1907 and 1910 his residence and postoffice address were said to be Salem, Va. He became president of the board of trade of Salem. He transferred his church membership to the Methodist Episcopal Church, South, at Salem, was on the

board of stewards of this congregation, and was the chief contributor of the necessary money for its new church building. His children went to the public schools of Salem without the payment of fees, which are required of non-residents, though there is no suggestion that he ever refused to pay such fees, or that he was ever asked to do so. When not on social or business trips to West Virginia or elsewhere, he spent his time in Salem. He purchased two burial lots in East Hill Cemetery, Salem, and removed the bodies of two of his dead children and interred them in those lots.

Though frequently so used, "residence" and "domicil" are not synonymous words and *domicil* has the larger significance. The meaning of the word *residence* depends upon the subject matter and connection in which it is used. In general terms it may be said to be the dwelling place of a person, but it may be either his permanent or temporary abode. In the construction of statutes, the meaning of the word *residence* depends upon the context and purpose of the statute. As used in one statute it may clearly refer to a mere business residence, while as used in another it may just as clearly refer to domicil as technically and strictly defined. In determining the meaning of the word in a particular statute, the legislative purpose and the context must always be kept in view. *Raymond* v. *Leishman,* 243 Pa. St. 64, 89 Atl. 791, L. R. A. 1915 A, 400, Ann. Cas. 1915 C. 783.

As used in the Virginia statutes (Code, secs. 491 and 494, as amended, Acts 1915, 219), so far as they relate to taxes upon intangible property, having no other situs for taxation, the words "residing therein" and the words "residing * * * in his district" can only refer to persons domiciled in the district of the local commissioner of the revenue who makes the assessment, for any other construction would inevitably lead to hopeless confusion and conflict between the different communities in this and in other States,

in which the taxpayer might have temporary residences, as well as to multiplied taxation upon the same property. *Pendleton* v. *Commonwealth*, 110 Va. 232, 65 S. E. 536.

The distinctions between domicil and residence have been frequently defined, but the difficulties of applying these distinctions to the facts of particular cases are very great indeed.

No better statement of the law and of these difficulties has been made than that of Chief Justice Shaw, in the case of *Thorndike* v. *Boston,* 1 Metc. (Mass.) 245, which is quoted with approval by Judge Cooley (Cooley on Taxation, 641) : "The questions of residence, inhabitancy or domicil—for although not in all respects precisely the same, they are nearly so, and depend upon much the same evidence—are attended with more difficulty than almost any other which are presented for adjudication. No exact definition can be given of domicil; it depends upon no one fact or combination of circumstances, but from the whole taken together it must be determined in each particular case. It is a maxim that every man must have a domicil somewhere; and also that he can have but one. Of course it follows, that his existing domicil continues until he acquires another; and *vice versa,* by acquiring a new domicil, he relinquishes his former one. From this view it is manifest that very slight circumstances must often decide the question. It depends upon the preponderance of the evidence in favor of two or more places; and it may often occur that the evidence of facts tending to establish the domicil in one place would be entirely conclusive, were it not for the existence of facts and circumstances of a still more conclusive and decisive character, which fix it, beyond question, in another. So on the contrary, very slight circumstances may fix one's domicil, if not controlled by more conclusive facts fixing it in another place."

In *Bruner* v. *Bunting*, 15 Va. Law Reg. 516, Kelly, Judge, in a contested election case, summarizes the authorities thus:

"In the case of *Long* v. *Ryan*, 30 Gratt. (71 Va.) 718, Judge Staples, in delivering the opinion of the Supreme Court of Appeals of Virginia, shows that "residence" within the meaning of the suffrage laws is clearly distinguishable from the same word as used in its popular sense to denote merely the act of abiding or dwelling in a given place. Both the word "residence" and the word 'domicil' have been the occasion of more or less confusion by reason of the different meanings which they are used to convey in different connections. It may be safely said, however, that as used in the Virginia election laws, 'residence' is substantially synonymous with 'domicil' as the latter word is defined in the opinion of Judge Staples in *Long* v. *Ryan*, *supra*. He says:

" 'There is, however, a wide distinction between domicil and residence, recognized by the most approved authorities everywhere. Domicil is defined to be residence at a particular place, accompanied with positive or presumptive proof of intention to remain there for an unlimited time. To constitute domicil two things must concur—first, *residence;* secondly, the intention to remain there. *Pilson, Trustee*, v. *Bushong*, 29 Gratt. (70 Va.) 229; *Mitchell* v. *United States*, 21 Wall. (U. S.) 350, 22 L. Ed. 584. Domicil, therefore, means more than residence. A man may be a resident of a particular locality without having his domicil there. He can have but one domicil at one and the same time, at least for the same purpose, although he may have several residences.'

"In *Lindsay* v. *Murphy*, 76 Va. 428, Judge Burks, quoting with approval from a previous opinion of our Supreme Court written by him, said:

" 'Residence, with no present intention of removal, constitutes domicil. Mere change of place is not change of domicil. Mere absence from a fixed home, however long continued, cannot work the change. There must be the *animus* to change the prior domicil for another. To constitute a new domicil two things must concur—first, residence in the new locality; second, the intention to remain there. Until the new domicil is acquired, the old one remains and whenever a change of domicil is alleged, the burden rests upon the party alleging it. These principles are said to be axiomatic.'

"In a comprehensive note to *Berry* v. *Wilcox*, 48 Am. St. Rep. 711, the annotator shows by a strong array of authorities too numerous to be repeated here, that every person must for all purposes have a legal residence or domicil somewhere; that he can have but one; that a domicil once acquired continues to exist until another is acquired elsewhere; that to effect a change of domicil there must be an actual abandonment of the former one coupled with an intent not to return to it, and also a new domicil acquired at another place, which can only be done by the union of intent and personal presence; that mere change of dwelling place, however long continued, does not of itself constitute change of domicil; and that the burden of proving the abandonment of the old and the acquirement of the new is upon the party making the charge. (See also to the same general effect *Pendleton* v. *Commonwealth*, 110 Va. 229, decided at Staunton, September 16, 1909, 65 S. E. 536).

"Mr. Raleigh Minor, in his work on Conflict of Laws, at page 114 (sec. 59), says:

" 'It must be observed that neither presence alone, nor intention alone will suffice to create a domicil of choice. Both must concur, and at the very moment they do concur the domicil is created. As it is sometimes expressed the *factum* (presence) and the *animus* (intention) must unite.

And thereafter no changes of locality alone (there being no change of intent), or, *vice versa,* no change of intention (there being no change of locality) will effect an alteration of the domicil of choice, which remains where it was, until the *factum* and the *animus* again unite.'

"It is also settled law that where the intention of the party is in doubt, the fact of his returning regularly to vote, and the fact of his continuing to serve on juries at the place of former domicil, are among the best evidences that there has been no abandonment of the old, and no purpose to acquire a new one—*Mitchell* v. *United States,* 21 Wall. 350, 22 L. Ed. 584; 14 Cyc. 862-3; Minor on Conflict of Laws, sec. 64; *Murry* v. *McCarty,* 2 Munf. (16 Va.) 393; *Shelton* v. *Tiffin,* 6 How. (U. S.) 184, 12 L. Ed. 387."

In 9 R. C. L. 538, this is stated: "It is a fundamental rule that every man is deemed to have a domicil somewhere, that he can have but one, and that until another is acquired elsewhere he retains his domicil of origin. Consequently one domicil cannot be lost until a new one is acquired, and conversely the acquisition of a new domicil *ipso facto* terminates the old."

The most recent and comprehensive collection and review of the authorities is found in a note to *The King* v. *Board of Assessors* (41 New Bruns. 564), Ann. Cas. 1917 B, 727.

The debatable question here then is one of fact, to be determined from the evidence.

If the facts relied upon by the appellees stood alone, they would be unquestionably sufficient to justify the inference that Cooper was domiciled at Salem, Va., and hence that his estate is liable to taxation there upon his intangible property, while, on the other hand, if there were no other facts than those relied upon by the appellant to show that Cooper never relinquished his domicil at Cooper's, W. Va.,

they would be sufficient to justify the conclusion that Cooper had not changed that domicil, and hence that his estate is not so liable.

It being established that from his childhood and prior to 1905 Cooper's domicil was in West Virginia, the burden is upon those who allege such change of domicil to establish it. The evidence shows that upon every occasion upon which the subject was discussed, Cooper plainly made his purpose evident, namely, that he did not propose to give up his legal domicil in West Virginia, and he also indicated his reasons for that purpose to be, that his chief business was there, his largest property interests were there, that he was postmaster there and apparently desired to continue to hold the office, which he felt that he could not do if he changed his domicil; and in 1905, when asked to list his intangible property, he refused to do so and distinctly tendered the issue of fact which is involved to the commissioner of the revenue. That issue was tendered each year thereafter to the public authorities when he filled out and returned his tax interrogatories, having first erased all that part of the blank which indicated that he was a citizen domiciled in Virginia and hence liable to taxation upon his intangible property as well as to the capitation tax.

In doubtful cases particular significance should be attached to the repeated exercise of the right to vote, because this right depends upon citizenship and domicil, and must be generally, if not universally, supported by the oath of the voter. Its unlawful exercise subjects him to prosecution both for illegal voting and for perjury if he swears falsely, and such act is a distinct, unequivocal and public assertion by the voter of his legal domicil. It clearly appears that Cooper, by every means in his power except that he built a house for his family in Salem in which he lived

with them, and that he became interested in the local enterprise of the community, evidenced his purpose to maintain his citizenship in West Virginia.

It is imperative that these established distinctions between domicil and residence be maintained so that the political and property rights of individuals may be preserved, and that the right of each community to levy taxes upon the intangible property of its domiciled citizens may be unquestioned.

The residence of the President is in the White House at Washington, while the domicil of the incumbent is in New Jersey; the residence of ambassadors during their terms must be at the capitals of the foreign countries to which they are accredited, while their domicils remain in the territory of their own governments; many other public officials, voluntarily or because required by law to do so, change their residences during their terms but retain their original domicils, in which they continue to exercise their political rights during their terms and to which they return at the expiration thereof; and many other persons, either for pleasure, health or business reasons, have and maintain several residences while they retain and can retain but one domicil. As to all of these classes of persons, and those included therein are numerous, their domicils determine their right to vote as well as the *situs* for taxation of their intangible property.

It is argued by counsel in this case with very great force, that Cooper could not do the inconsistent things which he has done and yet retain his domicil in West Virginia. It is, however, not difficult to suggest reasonable explanations of these apparent inconsistencies. While the value of his dwelling built in Salem certainly indicates an intention to reside there permanently, it is not conclusive of the question, and his statement that he intended it only as a home for his family until his children were educated,

though it may be fairly questioned, is not incredible. The removal of his church membership to Salem was perfectly natural because he expected to be there for many years. His purchase of the burial lots there was also natural and of little probative value, because many sentimental reasons influence the selection of burial places for our dead, having little reference to legal domicil—among many others, the beauty of the cemetery and the ease with which the lots may be cared for in the future—and the selection in this case might have been because Salem was, before her marriage, the home of Mrs. Cooper. The responsibility for his becoming president of the Salem board of trade must rest upon the membership of that body, and should doubtless be construed to be a compliment paid to him as a man of "probity and integrity" (the character which is conceded to him in the evidence) and in recognition of the fact that he was generous, public-spirited, had contributed largely to the religious efforts of the community, and had invested most liberally in its business enterprises. Knowing that he still claimed his legal domicil in West Virginia, possibly they wished him to change his purpose and to identify himself still more completely with the community which was profiting by his residence there. His signature to documents which stated that he was a resident of Salem would be convincing and conclusive in most cases, but loses much of its force in this case because of his contemporaneous declarations that he was a domiciled citizen of Cooper's, West Virginia, together with the probability, as indicated by his acts and statements, that he was advised of the legal distinction between domicil and residence and that he used the word resident in its restricted sense. That he failed to pay for sending his children to the Salem public schools may be explained by the fact that he was never asked to pay therefor, and it is probable that he was not asked to do so because he directly contributed to their maintenance

as a large taxpayer on his real and tangible personal property located there, and indirectly did so through his considerable investments in the stock of local corporations which were taxable there.

While the failure of the local authorities in Virginia to contest the issue made by Cooper as to his legal domicil during his lifetime does not preclude the Commonwealth and the other appellees from now asserting their claims, at the same time the fact that the issue then tendered by him was not contested in his lifetime is a circumstance which should be considered in weighing the testimony and in determining the *bona fide* character of his acts and declarations. It is also worthy of comment that his view of the question was not contested until four years after his death. If he were living he would certainly be the most material witness to sustain his contention and much would depend upon the character of his testimony and his explanation of, or failure to explain, his apparent inconsistencies.

From a careful consideration of the evidence, we have reached the conclusion that the circuit court erred in deciding that Cooper's intangible property is liable to taxation in Virginia, and the determination of this question makes it unnecessary to consider several other interesting questions which the record discloses.

The judgment will be reversed, the appellant exonerated from the payment of the taxes erroneously assessed against him, and the case remanded to the Circuit Court of Roanoke county, with directions to enter such further orders, if any, as may be necessary, in accordance with the views herein expressed.

*Judgment reversed.*