## Richmond

## COMMONWEALTH OF VIRGINIA V. J. FREDERIC KERNOCHAN, COMMITTEE, ETC.

### March 17, 1921.

1. TAXATION—*Domicile—Insane Person.*—An action for the recovery of alleged omitted taxes on intangible property cannot be maintained against the committee of an insane person, where the domicile of such insane person is in another State, notwithstanding that the insane person during the period for which the taxes were sought to be recovered was either an inmate or under the control of the Eastern State Hospital at Williamsburg.

2. TAXATION—*Domicile or Residence as Determining Situs.*—In Virgonia domicile, as distinguished from residence in the more ordinary and usual sense, fixes the situs for the taxation of intangible personal property.

3. DOMICILE—*Insane Person—Change of Domicile—Burden of Proving Change.*—Where an insane person's domicile was clearly in New York at the time of her commitment to a hospital in this State, it remained in New York, notwithstanding her continued presence in Virginia, unless it was changed by some competent and authorized person or tribunal, and the burden of proving the change is on the party alleging it.

4. DOMICILE—*Change of Domicile—Insane Person.*—Because of lack of mental capacity an insane person cannot change her domicile.

5. INSANE PERSON—*Domicile—Authority to Change Domicile.*—Authority to change the domicile of an insane person, if it exists at all, must be found in her committee and the courts having jurisdiction of her person and estate.

6. INSANE PERSON—*Domicile—Authority of Guardian or Committee to Change Domicile.*—The guardian or committee of an insane person, other than one occupying the position of a parent, has no power to change his ward's domicile from one State to another. Such a change might materially impair or affect some of the substantial personal or property rights of the insane person, as well as the right of succession at his death.

7. INSANE PERSON—*Domicile—Authority of Guardian or Committee to Change Domicile—Case at Bar.*—In the instant case, an action to recover omitted taxes on the intangible property of an insane person, it was clear that such person became insane while her domicile was in New York; that her parents, who were then living, never attempted or intended to make any change in her domicile; and that her parents made no provision for the appointment of a guardian or committee who would stand in *loco parentis.*

    *Held:* There was no competent mind or authority which could have changed the domicile of the insane person from New York to Virginia.

8. TAXATION—*Insane Person Domiciled in Another State—Failure of State of Domicile to Tax.*—In an action to recover alleged omitted taxes on the intangible property of an insane person domiciled in the State of New York but residing in Virginia the fact that it appeared that the insane person's estate in a large measure escaped taxation in New York is not material as the question was not whether the State of New York had been wrongfully deprived of taxes upon the estate of the insane person, but whether Virginia had the right to claim and collect the tax.

Error to a judgment of the Circuit Court of the city of Williamsburg and county of James City, in an action of assumpsit. Judgment for defendant. Commonwealth assigns error.

*Affirmed.*

The opinion states the case.

*Jno. R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General, S. O. Bland* and *Frank Armistead,* for the Commonwealth.

*Henry F. Miller* and *Meredith & Meredith,* for the defendant in error.

KELLY, P., delivered the opinion of the court.

Pursuant to the provisions of the act of March 24, 1914, as amended March 21, 1916 (Acts 1916, p. 729), this action

of assumpsit was brought against J. Frederic Kernochan, committee of Marie Marshall, for the recovery of alleged omitted taxes on intangible property for the years 1897 to 1914, both inclusive, and taxes assessed on such property for the year 1915, claimed to be due the State of Virginia and the city of Williamsburg, aggregating over $800,000— the taxes on the real and personal property located in this State having been regularly paid. A jury was waived, all matters of law and fact were submitted to the court, and a judgment rendered for the defendant.

[1, 2]    The question in the case is whether the taxes sued for could be lawfully assessed against the intangible personal property of Marie Marshall, who is now, and has been since 1872, *non compos mentis,* and during all of that time either an inmate or under the control of the institution now known as the Eastern State Hospital, at Williamsburg.

The lower court held that Miss Marshall's domicile was in the State of New York, and based its decision largely, if not wholly, upon that ground. This finding of fact being in our opinion correct the judgment complained of must be affirmed. The further question, discussed at considerable length before us, whether the domicile of the incompetent or that of the committee determines the situs for taxation becomes immaterial, because in this case the domicile of both is in a foreign State. It is to be noted in the outset that in Virginia domicile, as distinguished from residence in the more ordinary and usual sense, fixes the situs for the taxation of intangible personal property. *Pendleton* v. *Commonwealth,* 110 Va. 232, 65 S. E. 536; *Hurt* v. *Bristol,* 104 Va. 213, 216, 51 S. E. 223, 7 Ann. Cas. 679; *Cooper's Admr.* v. *Commonwealth,* 121 Va. 338, 344, 93 S. E. 680; *Talley* v. *Commonwealth,* 127 Va. 516, 103 S. E. 612.

We quote the following as to the facts of the case from the written opinion of the learned judge who tried the case below:

"Miss Marie Marshall was born in New Orleans. When a child between eight and ten years of age, she was brought by her parents to the city of New York, which became the residence and domicile of Mr. and Mrs. Marshall and of their children. She resided in New York city during her minority with occasional visits to an aunt living at Petersburg, Va. As she approached her majority, her mind became impaired. While on a visit with her mother to her aunt in Petersburg, her mental condition became such that she was taken to the Eastern Lunatic Asylum at Williamsburg, and was admitted as an insane pay patient on October 8, 1872, by the board of directors of the asylum. She remained an inmate of the asylum—hospital, as it was later named—until the year 1897, when she was moved to a house and grounds adjacent to the hospital, purchased for her by a proceeding had in the Supreme Court of New York. She has ever since occupied this abode.

"The intangible property owned by Miss Marshall was derived from her father's and mother's estates. John R. Marshall died in 1881 in New York, and his will was probated in the county of New York leaving his entire estate to be held in trust for his wife, and at her death to be divided equally among his three daughters. Mrs. Evelin Marshall, the mother, died in 1885, and her will was probated also in New York, and her residuary estate was divided among her three daughters. The share of Miss Marshall was left to the executors of Mrs. Evelin Marshall in trust for the use of Marie Marshall.

"In 1894 proceedings were instituted in the city of New York and as the result of said proceedings Marie Marshall was adjudicated insane and incompetent, and the defendant, J. Frederic Kernochan, was appointed committee by the Supreme Court of New York of the person and estate of Marie Marshall, and qualified as such by entering into a bond of $1,280,000 in December, 1894. In an action brought for an

accounting by the trustees under the will of John R. Marshall, it was ordered by the Supreme Court of New York that the trustees transfer to the committee all the surplus income accumulated in their hands as the property of Marie Marshall, and by an order of the said court dated October 5, 1895, the trustees under the will of Mrs. Evelin G. Marshall were directed to pay over the accumulated income arising under the trust to Mr. Kernochan, acting as committee.

"After the death of Mrs. Marshall, the trust created by John R. Marshall for the life of his wife, continued a period of twelve years for the benefit of his daughters. After the termination of such period, the trustees instituted an action for an accounting in the separate trust for the benefit of Marie Marshall under her father's will, and a judgment of the New York Supreme Court was entered April 6, 1898, which decreed that the *corpus* of this estate be paid over to J. Frederic Kernochan, committee. Owing to an appeal, however, being taken, this judgment did not go into effect until February, 1901, when the Court of Appeals sustained the judgment of the lower court and directed the transfer of the *corpus* of the estate of the incompetent to the committee of Marie Marshall.

"An accounting action was then brought by Mr. Kernochan, at that time sole committee of the person and estate of Marie Marshall. In this action an order was entered on May 8, 1901, appointing the New York Life Insurance and Trust Company to act in conjunction with Mr. Kernochan, as committee of the estate of Marie Marshall, and directing Mr. Kernochan to transfer to the New York Life Insurance and Trust Company all the property in his hands as committee, and to deposit the same with the New York Life Insurance and Trust Company, and it was also ordered that upon such delivery and deposit with the New York Life In-

surance and Trust Company being made, the bond given by
Mr. Kernochan as sole committee should be annulled.

"Prior to the appointment of the New York Life Insur-
ance and Trust Company as co-committee, Mr. Kernochan
made application to the court of the city of Williamsburg
to be appointed committee in Virginia of Miss Marshall, and
in February, 1895, he was appointed by that court as com-
mittee, and entered into a, bond in the penalty of $2,000
as such committee.

"In August, 1895, Mr. Kernochan, as committee of the
person of Miss Marshall, applied to the New York Supreme
Court for authority to purchase a house and grounds as a
residence for Miss Marshall, adjacent to the Eastern State
Hospital, in Williamsburg, and to make the necessary ex-
penditure for such purpose, and for the improvement of the
house and grounds as so purchased.  The court granted
the authority asked for, and such funds as were necessary to
carry it into effect, and in 1897 Miss Marshall was removed
to the house purchased for her.  But before such removal
was had, an agreement between J. Frederick Kernochan and
the Eastern State Hospital was entered into, dated May 21,
1896, reciting in its preamble that the party of the first
part had been duly appointed committee of the person and
estate of Marie Marshall in the States of Virginia and New
York, by orders and decrees of the courts of each of said
States having jurisdiction of the said matter, that the party
of the first part is a resident of the State of New York and
his ward is and has been an inmate of the Eastern State
Hospital, situated in Williamsburg, Virginia, and that 'it
is the desire of the party of the first part in his capacity as
committee of the person of the said Marie Marshall that
she should continue to be and remain in and under the cus-
tody and control of the board of directors of the said
Eastern State Hospital, although she is to reside in a cot-
tage of her own outside of and adjoining the grounds of

the said Eastern State Hospital,' and in the granting clause
of the agreement it is provided that 'all the care and control
of the person of the said Marie Marshall, and all questions
in regard to mode of life, diet, regimen, exercise, amuse-
ment, regulations of personal attendance, and, indeed, all
questions relating to Marie Marshall personally, or in any
way relating to the health and happiness of her mind and
body, shall be under the supreme control of the board of di-
rectors of the said Eastern State Hospital, to be exercised
by its chief medical superintendent;' and in the fourth
paragraph of the agreement the statement is made: 'it is
expressly understood and agreed that the question of Miss
Marshall's health and happiness is of the most paramount
importance, and at any and all times every question in the
management of said house must yield to the decision of the
board of directors of the said Eastern State Hospital as
expressed by its chief medical superintendent.' An adden-
dum to this agreement was made on the 17th day of May,
1900, dealing with the installment of a water system, and it
provided that 'the arrangement herein set forth shall con-
tinue for a reasonable time, in the event of the death or re-
moval of Miss Marshall, as outlined by Mr. Kernochan, com-
mittee, in his letter of April 14, 1899, hereto attached and
made a part of this agreement, and it is further understood
and agreed that under no circumstances shall this contract
be terminated during the lifetime of the said Marie Mar-
shall without reasonable notice.' "

[3-4] Miss Marshall's domicile was clearly in New
York at the time of her commitment to the hospital.
There is no room for controversy upon this point. It
has remained in New York to this day, notwithstanding
her continued presence in Virginia, unless it has been
changed by some competent and authorized person or tri-
bunal, and the burden of proving the change is on the party
alleging it. *Cooper's Administrator* v. *Commonwealth, su-*

*pra; Talley* v. *Commonwealth, supra.* If such change has been made, when and by whom was it done? Miss Marshall could not have done it because she lacked the mental capacity.

[5]    The question then is whether her domicile, independent of her own will, has been changed for her by some competent agency and authority. Such agency and authority, if it existed at all, must, of course, have been found in her committee and the courts having jurisdiction of her person and estate.

[6]    In their learned and resourceful arguments and briefs, counsel on both sides have dealt at length with the two branches into which this question naturally divides itself, namely: (1) did Miss Marshall's committee possess the power to change her domicile from New York to Virginia; and (2) if so, did he ever exercise that power? The Commonwealth contends for an affirmative, and the defendant for a negative answer to both of these questoins. The former, to prevail in this case, must maintain such an answer to both, while a negative answer to either concludes the case in the defendant's favor.

Very much of the able and painstaking opinion of the trial court was addressed to the question of the committee's intention to make a change in the domicile of his ward; and the conclusion was there reached that no such intention had been shown. We find it unnecessary to deal with that aspect of the case, however, inasmuch as we are of opinion that regardless of any question of intention, the better reason and authority is to the effect that the committee had no power to make the change.

Mr. Raleigh Minor, in his work on Conflict of Laws, on page 109, states the law as follows:

"The question remains, what is the locality of the lunatic's domicile when he is himself too insane to choose one? Shall the guardian or committee have power to change it, or must

it remain unalterably where it was when the disability was first incurred? This case is closely analogous to that of the guardian's power to change an infant ward's domicile, already discussed. As to the lunatic's municipal domicile, it seems that the guardian has the power, but not so with respect to his national or quasi-national domicile. His latter domicile will remain unchanged, regardless of the place of his actual residence. He will retain the domicile he possessed before he became insane upon the principle that a domicile once acquired is retained until another is gained."

As Mr. Minor points out, the question here "is closely analogous to that of the guardian's power to change an infant ward's domicile." With respect to the latter, the better doctrine seems to be that the guardian may change the municipal domicile whenever such course is for the best interest of the ward, but that (unless he be the natural guardian or at least one occupying that relation) he may not make any national or quasi-national (interstate) change of the domicile. Minor on Conflict of Laws, p. 90; *Lamar* v. *Micou,* 112 U. S. 542, 5 Sup. Ct. 221, 28 L. Ed. 758. These authorities point out the important considerations justifying this limitation upon the guardian's authority. The change of the ward's domicile from one place to another in the same State "does not expose him to be subjected to any change in the law governing him and his property as does a change of his natural domicile. The courts are very jealous of a change of that character."

In *Sumrall's Committee* v. *Commonwealth,* 162 Ky. 658, 172 S. W. 1057, an insane person had been taken from Kentucky and placed in a Maryland asylum, and it was claimed that the estate was not taxable in Kentucky. The court held otherwise, and said in part: "From the appellant's appointment as committee to the present time, the status of the ward and his estate has remained unchanged, and there is no claim and it cannot be that the insane ward fixed his dom-

icile in Maryland, but asserted only that appellant before September 1, 1913, elected to fix the ward's domicile in that State. In order to enable one of sound mind to change his domicile or acquire a new one, there must be (1) freedom of choice, (2) bodily presence in the chosen locality, (3) intent to remain there permanently. But an insane person is incompetent to exercise either choice or intention, nor can these twin elements, essential to the acquisition of a new domicile in another State, be supplied by the committee of an insane person."

The Kentucky court, in that case, after quoting from Minor on Conflict of Laws (p. 109, *supra*), said: "It will be observed that the text last quoted draws a distinction between a municipal domicile and a national or quasi-national domicile. We may concede that appellant as committee has, as claimed by him, all the power that a guardian possesses with respect to the control of the person and estate of his ward, and that by virtue of such power it may change within the bounds of the State the municipal or county domicile of the lunatic of whose person and estate it is the committee, but we do not give our assent to the proposition that a guardian or committee has the power by the right of election to change the domicile of the ward from this State to another State. * * * The brief of appellant's counsel seems to take no account whatever of the distinction between the within-State or municipal domicile and the out-of-State, national or quasi-national domicile, or to realize the fact that in this jurisdiction the right of the committee to change the domicile of the ward by removing it to another State has never been recognized."

In *Lamar* v. *Micou*, 112 U. S., *supra*, Mr. Justice Gray said: "But it is very doubtful, to say the least, whether even a guardian appointed in the State of the domicile of the ward (not being the natural guardian or a testamentary guardian) can remove the ward's domicile beyond the limits

of the State in which the guardian is appointed, and to which his legal authority is confined. *Douglas* v. *Douglas,* L. R., 12 Eq. 617, 625; *Daniel* v. *Hill,* 52 Ala. 430; Storey on Conflict of Laws, sec. 506, note; Dicey on Domicile, 100, 132. And it is quite clear that a guardian appointed in a State in which the ward is temporarily residing cannot change the ward's permanent domicile from one State to another."

In *Ex parte Bartlett,* 4 Bradf. Sur. (N. Y.) Rep. 221 (cited in *Lamar* v. *Micou,* 112 U. S. 452, 5 Sup. Ct. 221, 28 L. Ed. 751), it is said, on p. 225, referring to a guardian: "There would appear to be no ground for challenging such a control over the residence of the minor as shall not withdraw him from the jurisdiction of his domicile of origin. In the present instance, the residence of the infant has been changed from one county to another, but still has been retained under the sovereignty of the same laws. This, I have no doubt, is completely under the scope of the guardian's authority. No rights are impaired or affected by the act. The jurisdiction of the State is preserved."

To the same general effect as the above authorities is Long on Domestic Relations, secs. 179, 190.

We fully realize that the authorities upon this question are not in harmony. An extended review of them would prolong this opinion without affecting the result or accomplishing any good purpose. It will be found, however, that most of them which appear to support the power of a guardian or committee to make a change of the ward's domicile either relate to the municipal as distinguished from the national or quasi-national domicile, or relate to cases of change by a parent or one standing in the relation of a natural guardian. The case in hand is not within either of these lines of authority. In so far as there is any necessary conflict in the decisions as to the case here presented, we feel constrained to follow those holding that a guardian or committee, other than one occupying the position of a

parent, has no power to change his ward's domicile from one State to another. Such a change, as the authorities point out, might materially impair or affect some of the substantial personal or property rights of the insane person, as well as the right of succession at his death.

[7]   In this case it is perfectly clear that Miss Marshall became insane while her domicile was in New York; that her parents, who were then living, never attempted or intended, and in all probability would not have been willing to make any change in her domicile; that her parents made no provision for the appointment of a guardian or committee who would stand in loco parentis; and that, therefore, there has been no competent mind or authority which could have changed her domicile from New York to Virginia. Having reached this conclusion, it follows that the judgment of the lower court must be affirmed.

[8]   It appears that Miss Marshall's estate has in a large measure escaped taxation in New York. Counsel for the committee contend that this result was lawfully accomplished, and was due to the alleged fact that according to the law in New York the actual physical residence and not the domicile of the taxpayer fixed the situs for taxation. On behalf of the Commonwealth it is contended that the committee, in proceedings by which the exoneration in New York was accomplished, affirmatively recognized by affidavits and otherwise that Miss Marshall had become domiciled in Virginia. The lower court sustained the committee's contention, holding that nothing done by the committee amounted to an admission that she was domiciled in Virginia, or showed any intent to change her domicile from New York to the latter State. Whether the decision be rested upon that ground or upon the ground upon which we have placed it, the result is the same; and the question for us to decide is not whether the State of New York has been wrongfully deprived of taxes upon the estate, but whether

Virginia has the right to claim and collect the tax. *Buck* v. *Beach*, 206 U. S. 392, 27 Sup. Ct. 712, 51 L. Ed. 1106, 1112, 11 Ann. Cas. 732.

For the reasons stated, we are of opinion that there is no error in the judgment complained of, and the same is affirmed.

*Affirmed.*