### CHEW v. NICHOLSON et al.

(District Court, D. Delaware. May 18, 1922.)

No. 66.

**1. Domicile ⬚5—Confinement of insane person in another state held not to effect change of domicile.**

    Decedent, as were her parents, was born in Delaware, where she resided until 22 years of age, when she became incurably insane, and, there being no state asylum in Delaware, was placed by her mother in an asylum in Philadelphia. Her mother removed to Philadelphia and resided there for 12 years, when she returned to Delaware and remained until her death. After decedent's commitment, her mother, on her own application, was appointed by the Delaware court trustee of her person and estate, consisting of property in Delaware, and after the mother's death a successor trustee was appointed. Neither ever took any steps to change the domicile of decedent. *Held* that, though she had no near relatives residing in Delaware for many years before her death, her domicile continued in that state.

**2. Domicile ⬚4(1)—Residence alone will not effect change of domicile.**

    Residence alone, however long continued, will not effect a change of domicile.

**3. Domicile ⬚4(1)—Insane adult cannot change domicile.**

    One who, after attaining majority, becomes mentally incompetent to change his domicile, retains the domicile which he had when he became insane.

**4. Domicile ⬚4(1)—Trustee of insane person cannot change state of his domicile..**

    The trustee or committee of an insane adult is without power to change his domicile to another state.

At Law. Action by Emily Cleland Townsend Chew against John R. Nicholson and George Lodge, administrators of the estate of Hannah Ann Cleland, deceased. Trial to court, and judgment for plaintiff.

John R. Nicholson, of Wilmington, Del., for plaintiff.

Herbert H. Ward and George Lodge, both of Wilmington, Del., for defendants.

MORRIS, District Judge. This suit at law, wherein Emily Cleland Townsend Chew, a citizen and resident of the state of New York, is plaintiff, and the administrators of Hannah Ann Cleland, deceased, are defendants, is for the recovery of a distributive share of decedent's estate, and was tried to the court without a jury upon an agreed state of facts. The defendants are citizens and residents of the state of Delaware, and were appointed the administrators of decedent by a

Delaware court. A net balance of $59,068.11 remains in their hands for distribution. The decedent died intestate, unmarried, and without issue. Those entitled to decedent's estate as her next of kin are her five nephews and nieces, of whom plaintiff is the daughter of one sister, and the remaining four are children of another sister of the decedent. The laws of the state of Delaware provide for distribution per stirpes, while the laws of the state of Pennsylvania provide for a per capita distribution among nephews and nieces. Plaintiff, contending that at the time of decedent's death her domicile was in this state, claims to be entitled to the one-half part of the net estate, and by this suit seeks judgment therefor. The remaining nephews and nieces, contending that decedent was domiciled in Pennsylvania, have made demand upon the administrators for a per capita distribution. Consequently the fundamental question, and the one upon which the amount of the judgment to which plaintiff is entitled depends, is: Where was decedent's domicile at the time of her death?

[1] The decedent was born in Delaware on September 30, 1835, and died on March 2, 1920, at Philadelphia, in the Pennsylvania Asylum for the Insane, Kirkbride's, where she had been confined since 1860. Her parents, Nelson Cleland and Ann C. Cleland, were natives of Delaware, who died and were buried in that state. Nelson Cleland died in 1854 and Ann C. in 1889. Except when attending a "finishing school" in Philadelphia, the decedent lived continuously in Delaware from the time of her birth until some time in 1857, at which time she was 22 years of age. In that year Ann C. Cleland, her mother, took decedent and decedent's two sisters to Brooklyn, in the state of New York, and there remained until the spring of 1860. On November 3, 1857, decedent was placed by her mother in the Pennsylvania Asylum for the Insane, Kirkbride's. The records of the asylum state that the residence of decedent at the time of her admission was Delaware, and that the nature of her illness was monomania. The asylum records do not show the duration of her confinement nor the date of her discharge, but in July, 1859, decedent was placed by her mother in Bloomingdale Hospital for the Insane in the state of New York. The records of the latter institution state that decedent was born in Wilmington, Del., that her place of residence was Brooklyn, and that her illness had been of two years duration. She was discharged from Bloomingdale, not improved, May 25, 1860.

Thereafter Ann C. Cleland, accompanied by the decedent, returned to Wilmington, and on August 29, 1860, again placed decedent in Kirkbride's where she remained continuously thereafter until her death. At the time of her admission the physicians pronounced her form of insanity to be dementia præcox, a form of insanity considered to be incurable. On September 28, 1860, Ann C. Cleland presented to the Chancellor of the state of Delaware her petition, praying that a commission in the nature of a writ de lunatico inquirendo issue, directed to the sheriff of New Castle county, to inquire of the lunacy of the decedent. The writ was issued and executed. It was found by the inquisition that at the time of taking the inquisition decedent "is a lunatic, and does not enjoy lucid intervals, so that she is not sufficient

for the government of herself and the management of her * * * estate, and that she, the said Hannah A. Cleland, hath been in the same state of lunacy from about the month of September, 1857." Upon the return of the writ Ann C. Cleland was, on November 5, 1860, appointed by the Chancellor "trustee to take charge of the person and management of the estate" of decedent. On September 22, 1884, Joseph L. Carpenter, a resident of Delaware, was, on the petition of Ann C. Cleland, appointed by the Chancellor of Delaware trustee of the proceeds of sale of decedent's interest in certain Delaware real estate.

Upon placing decedent in Kirkbride's in 1860, Ann. C. Cleland leased a house in Philadelphia, where she lived for about five years. She then moved to another house in the same city, and kept house with her daughter, Mrs. Townsend, and the latter's husband, until some time after the month of October, 1872, when, Mr. Townsend having failed in business, Ann C. Cleland, accompanied by the Townsend family, returned to Wilmington, where, in 1875, Mrs. Townsend died. Mr. Townsend then moved to Mississippi. Mrs. Cleland continued to live in Wilmington until 1889, the year of her death. By her will, dated July 8, 1886, wherein she describes herself as of Wilmington, Del., she divided her estate among her three children, or their descendants, and certain grandchildren. She named Joseph L. Carpenter and Joseph L. Carpenter, Jr., residents of Wilmington, trustees thereunder and executors thereof. Equitable Trust Company was substituted as trustee in December, 1889. Upon the decease of Mrs. Cleland, the Equitable Trust Company, a Delaware corporation, was appointed by the Chancellor of the state of Delaware trustee of the person and estate of the decedent, and thereafter continued to furnish the money necessary for her maintenance and comfort at Kirkbride's. The accounts of the trustee were regularly passed.

After the death of her mother, decedent had no near relatives residing in Delaware. Her surviving sister, a resident of New Jersey, died in 1895. Her nephews and nieces reside in New York, New Jersey, Massachusetts, and California. During the latter portion of the time that Mrs. Cleland was in Philadelphia, the decedent, as one of the symptoms of her insanity, manifested an aversion to her mother. As a consequence a friend of Mrs. Cleland, a Mrs. Hutchinson, of Philadelphia, visited the decedent for and instead of Mrs. Cleland. Decedent was buried in the Cleland burial lot in Wilmington. In the year 1860 the decedent, as tenant in common with her sisters, was seised in fee of real estate in the state of Delaware of the value of about $75,000, and continued so seised until the year 1918, when the greater portion thereof was sold by order of the Chancellor. Decedent did not at any time own any property in the state of Pennsylvania.

From the foregoing facts it is obvious that the decedent's domicile of origin was in the state of Delaware, and that, she having remained in this state after she became sui juris, her domicile of origin became also her domicile of choice. The choice of one domicile does not, of course, bar a subsequent choice of a different domicile; but decedent having in 1857, while domiciled in Delaware, become a lunatic without lucid intervals, she was thereafter without power by her own will or

act to change her domicile, for she then lacked the mental capacity of exercising either choice or intention, twin elements essential to a change of domicile. The question, then, is whether, independent of her own will, her domicile was changed for her from Delaware to Pennsylvania by some person or persons having the power and authority so to do. The burden of proving such change rests upon the party alleging it. Commonwealth v. Kernochan, 129 Va. 405, 106 S. E. 367, 369. The only persons exercising or purporting to exercise any control over the person of the decedent from the beginning of her insanity until her death were her mother and her trustees, appointed by the Chancellor of the state of Delaware. Consequently, under the facts of this case, such authority, if it existed at all, must have resided in the mother or in the trustees. Did the mother have such power, and, if she had, did she exercise it? It was held in Lamar v. Micou, 112 U. S. 452, 470, 5 Sup. Ct. 221, 229 (28 L. Ed. 751), that—

"As infants have the domicile of their father, he may change their domicile by changing his own; and after his death the mother, while she remains a widow, may likewise, by changing her domicile, change the domicile of the infants; the domicile of the children, in either case, following the independent domicile of their parent."

And (112 U. S. at page 471, 5 Sup. Ct. 230, 28 L. Ed. 751) it was further said that—

"The father, and after his death the widowed mother, being the natural guardian, and the person from whom the ward derives his domicile, may change that domicile."

. It has likewise been held that, where an infant is of unsound mind and remains continuously so, the incapacity of minority continues, so as to confer on the father the right of choice in the matter of the domicile of the child, and that the father's change of domicile effects a change in the child's domicile. Sharpe v. Crispin, L. R. 1 Prob. & Div. 611; Wharton's Conflict of Laws, § 53.

I have found no authority which extends, beyond the limits enunciated in the foregoing cases, the power of a parent or natural guardian to change an adult child's national or quasi national domicile. If such be indeed the boundary of power of a parent or natural guardian with respect to the matter in hand, then manifestly the mother was without authority in 1860 (prior to which time decedent's domicile was unquestionably in Delaware) to change decedent's domicile from Delaware to Pennsylvania; for guardianship by nature continued at common law only until the full age of 21 (Mauro v. Ritchie, Fed. Cas. No. 9,312), and has not in this country been carried beyond that age, unless it be so in legal effect, where the child at maturity is non compos mentis. The decedent, however, arrived at the full age of 21 in the year 1856, fully competent, and then became sui juris.

But assuming, without deciding, that in 1860 the mother had power to change decedent's domicile, yet the only things then or subsequently done by her, having any bearing at all upon the question of whether that domicile was changed, were the placing of decedent in an asylum in Pennsylvania and the residence of the mother for some years thereafter in the city of Philadelphia. In that year and for many years

thereafter the state of Delaware was without state hospitals for the insane, other than the county almshouses. Chapter 553, vol. 18, Laws of Delaware, and chapter 57, vol. 14, Laws of Delaware. Furthermore, any presumption that might arise from the act of the mother in placing the decedent in a Pennsylvania asylum, to the effect that she, knowing the incurable nature of decedent's malady, intended thereby to bring about a change of decedent's domicile, is, I think, more than overcome by the mother's subsequent application to the Chancellor of the state of Delaware to appoint a trustee, not only of the estate of decedent, but also to take charge of her person. The residence of the decedent was not then in Delaware, and if her domicile was not in Delaware, it is difficult to conceive upon what theory or principle the mother could ask the Chancellor to appoint a trustee to take charge of a person resident and domiciled out of his jurisdiction. Moreover, the mother accepted the appointment sought, and continued to exercise the powers conferred upon her, until her death in 1889, without thereafter doing any act looking to a change of decedent's domicile.

[2] If it be suggested that decedent's domicile was not changed merely by the act of the mother in placing the decedent in the Pennsylvania asylum, but by that act and the continued residence or confinement of the decedent within that asylum, such suggestion would, I think, be completely answered by the well-established principle of law that residence alone, however long continued, will not effect a change of domicile. Pickering v. Winch, 48 Or. 500, 87 Pac. 763, 9 L. R. A. (N. S.) 1159, 1164; Hayward v. Hayward, 65 Ind. App. 440, 115 N. E. 966, 116 N. E. 746. Intent or animus is likewise necessary. Mitchell v. United States, 21 Wall. 350, 22 L. Ed. 584; Sumrall's Committee v. Commonwealth, 162 Ky. 658, 172 S. W. 1057.

Still again, if it be contended that the mother, by her residence in Philadelphia for a number of years following the placing of decedent in the Pennsylvania asylum, thereby changed her own domicile and that the domicile of decedent, who was then incompetent, changed with that of her mother, I think this contention cannot prevail, because, as I view the facts set forth in the case stated, they are not sufficient to show that the mother's domicile was at any time changed from Delaware to Pennsylvania. Consequently I am of the opinion that, assuming (but not deciding) that the mother in her capacity of surviving parent had power to change decedent's domicile from the state of Delaware to the state of Pennsylvania, she did not at any time exercise that power.

[3, 4] Did decedent's trustees have the power so to change decedent's domicile, and, if so, was such power exercised by them, or any of them? It has been held by many authorities that the domicile of one who, after attaining majority, becomes mentally incompetent to change his domicile, retains the domicile which he had when he became insane. In Minor's Conflict of Laws, p. 109, the law is stated thus:

"The question remains: What is the locality of the lunatic's domicile when he is himself too insane to choose one? Shall the guardian or committee have power to change it, or must it remain unalterably where it was when the disability was first incurred? This case is closely analogous to that of the guardian's power to change an infant ward's domicile, already discussed. As

to the lunatic's municipal domicile, it seems that the guardian has the power, but not so with respect to his national or quasi national domicile. His latter domicile will remain unchanged, regardless of the place of his actual residence. He will retain the domicile he possessed before he became insane upon the principle that a domicile once acquired is retained until another is gained."

## Wharton's Conflict of Laws says:

"Whether a domicile acquired when sane can be devested by a guardian of the ward after the latter has become insane may be doubted. It has been denied in Maine, but affirmed in Vermont and Massachusetts.. The course, however, in order to work a change of domicile, is for the guardian to obtain an order of the proper court approving of it. Unless this be done, it should require strong proof of the expediency and bona fides of the change to subsequently sustain it. * * * The domicile of one who, after attaining majority, becomes mentally incompetent to change his or her domicile, remains where it was established at the time such incompetency supervened, unless it is changed by husband or guardian."

Mr. Dicey, in his work of the same title (2d Ed., p. 149), expresses the following views:

"There are two views as to the position of a lunatic when under control. The first is that he retains the domicile which he possessed at the time he became insane, or, more strictly, when he began to be legally treated as insane. This is the sound view, and is favored by the English cases on the subject. If this view be correct, the lunatic under confinement is in the same position as a prisoner. He cannot exercise choice or will. He cannot, therefore, acquire a domicile. Hence he retains his existing domicile. D., for example, is an Englishman, who becomes lunatic, and is under control. He is taken to Scotland, and placed in a Scotch asylum. He remains there until his death. He retains, on this view, his English domicile. The time in the asylum counts for nothing.

"The second view is that a lunatic is a person not sui juris, who stands in somewhat the same relation to his committee as a child to his father, and that, therefore, his domicile can be fixed by his committee. This view is favored by some American cases, but is open to objection. In the case of father and child, the infant's domicile follows that of the father; but a father cannot give his son a domicile apart from his own. In the case of a committee and a lunatic, it appears to be maintained, not that a lunatic's domicile follows that of the committee, but that it can be fixed by the committee, or, in effect, that a committee has greater power over the domicile of a lunatic than a father over that of his son. If the position of a committee be compared to that of a guardian, then it must be remarked that the power of a guardian to change a ward's domicile is itself doubtful. On the whole, the first view appears to be (at least under ordinary circumstances) the right one. The second arises from a confusion between the power to change a lunatic's residence and the right to change his domicile."

In Sumrall's Committee v. Commonwealth, 162 Ky. 658, 172 S. W. 1057, it was held that a guardian or committee was without power to change the domicile of the ward from Kentucky to another state. In Pittsfield v. Detroit, 53 Me. 442, it was held that an insane person, sent by the officers of his town to an insane hospital as a patient, did not thereby lose his residence and home before established in the town. Town of Freeport v. Supervisors of Stephenson County, 41 Ill. 495, holds that the confinement of a lunatic in an asylum does not change his residence. The courts of Alabama are in accord with the principle of these cases. Daniel v. Hill, 52 Ala. 430, 435. In Commonwealth v. Kernochan, 129 Va. 407, 106 S. E. 367, it was ruled that a guardian

or committee, other than one occupying the position of a parent, has no power to change his ward's domicile from one state to another. In Hayward v. Hayward, 65 Ind. App. 440, 115 N. E. 966, a well-considered case, it was held that, where deceased was mentally incompetent, the mother of her next of kin, being no blood relative of deceased and not appointed guardian, could not change deceased's domicile from Kentucky to Indiana, so as to change laws of succession, and that such change of domicile may be made by a guardian only under an order of court.

The trustees of Hannah Ann Cleland did not obtain an order of the Chancellor authorizing them to change her domicile from Delaware to Pennsylvania. The Supreme Court in Lamar v. Micou, 112 U. S. 452, 5 Sup. Ct. 221, 28 L. Ed. 751, found it to be generally held that a guardian appointed in the state of the domicile of the ward has the power of changing the ward's domicile from one county to another within the same state and under the same law, but doubted the power of the guardian to change the ward's domicile to another state. Anderson v. Estate of Anderson, 42 Vt. 350, 1 Am. Rep. 334, and Holyoke v. Haskins, 5 Pick. (Mass.) 20, 16 Am. Dec. 372, frequently cited as affirming the right of a trustee or guardian to change the domicile of a ward, do not deal with national or quasi national domicile, but merely with removal from one district or county to another in the same state.

The defendants rely largely upon In re Robitaille, 78 Misc. Rep. 108, 138 N. Y. Supp. 391. In that case it was found that Robitaille, before becoming insane, had decided to leave New York and return to Canada, his domicile of origin, and that his sudden insanity prevented his carrying that intention into effect. His committee removed him to Canada, where he died. It was held that at his death he was domiciled in Canada. But, in view of the fact that prior to his insanity Robitaille had formed the intent to return to Canada, this case does not hold that the animus necessary to a change of domicile may be supplied by the committee or trustee of an insane person. On the contrary, the thing decided was that, if the insane person has formed the intent, the factum may be supplied by the committee. Hence this case is not of material assistance in deciding the case at bar.

In view of the foregoing authorities and others of like purport, and in view of the absence of authorities deciding that a trustee of an insane person may as such change the legal domicile of such person from the state in which the trustee is appointed and to which his legal authority is confined to another state, I am of the opinion that the trustees of decedent were without that power. I am likewise of the opinion that, even assuming power so to change decedent's domicile resided in the trustees, such power was not exercised. True, the mother of decedent was her first trustee; but as trustee the mother had no greater or other powers than if she had been a stranger in blood. The powers and acts of the mother as surviving parent of decedent have been hereinbefore considered. As trustee she did no act indicating an intent to change decedent's domicile.

The succeeding trustee was a corporation. Changing the domicile of decedent from Delaware to Pennsylvania would have been a mat-

ter of importance. It is not to be presumed that a corporate trustee would attempt to bring about such a change in its ward's status without action by its board of directors. There is no evidence that the corporate trustee or its board of directors ever considered the matter or intended to effect a change in decedent's domicile. Its act in permitting the decedent to remain in the asylum in which she was at the time of its appointment as her trustee is, I think, far from sufficient to bring about a change in decedent's domicile, or even to indicate an intent on the part of the trustee that such change should be made. In fact, I think that evidence of an intent on the part of the mother or on the part of the trustees to change decedent's domicile from Delaware to Pennsylvania is wholly wanting.

For the foregoing reasons, I am of the opinion and find that decedent's domicile at the time of her death was in the state of Delaware, and not in the state of Pennsylvania.

Judgment for plaintiff, in accordance with this finding and the case stated.