## SEALEY v. UNITED STATES.
### No. 5554.

District Court, E. D. Virginia, Norfolk Division.

May 11, 1934.

Warren E. Miller, of Washington, D. C., and F. F. V. Staples, of Portsmouth, Va., for plaintiff.

Russell T. Bradford, Asst. U. S. Atty., of Norfolk, Va.

J. L. Morewitz, of Newport News, Va., for Amy Marie Sealey.

WAY, District Judge.

This proceeding was instituted by Nellie V. Sealey, widow of Arthur Lee Sealey, in her capacity as administratrix of his estate, to recover on two war risk insurance policies of $5,000 each, issued to said Sealey. The policies were in full force at the time of his death. Amy Marie Sealey, herein referred to as the "second wife," a resident of Pennsylvania, having been duly served with notice of these proceedings, pursuant to the statute (U. S. C. title 38, § 445 [38 USCA

§ 445]) "appeared specially" and moved the court to dismiss on the ground that the hustings court for the city of Portsmouth, Va., which appointed Nellie V. Sealey administratrix, was without jurisdiction so to do because, defendant alleges, Arthur Lee Sealey at the time of his death did not reside in Virginia, but was domiciled in Pennsylvania, and that the proper court of that state alone has jurisdiction to make such appointment.

It appears from the evidence that Arthur Lee Sealey was born in Warwick county, Va., July 19, 1886. He enlisted in the United States Navy January 23, 1909, in which service he remained until his death in February, 1919. For some time following his enlistment he was a member of the crew of the Georgia, which vessel had its home port at Hampton Roads, Va.

Sealey was lawfully married to plaintiff, whose name before her marriage was Nellie V. Hale, in Portsmouth, Va., November 3, 1909, in which city she has lived nearly all her life. He established a home in Portsmouth where they lived together as man and wife whenever Sealey was ashore, until some time in 1913, except that during a part of the time they lived with a brother of Sealey, at the brother's home in Warwick county, near the place of Sealey's birth.

About 1915 or 1916 Sealey was ordered to Newport, R. I., and later to Boston, Mass. Some time in 1916 he was transferred to the Kansas, the home port of which vessel was Philadelphia. He remained with the Kansas with its headquarters at Philadelphia until May, 1917, when he was ordered overseas for active duty in the World War. He was overseas continuously from May, 1917, until January 20, 1919, with the exception of a thirty days' leave, which he spent in or around Philadelphia. On January 20, 1919, he was ordered back to Philadelphia, and on the 30th of the same month he entered a United States naval hospital in Philadelphia, where he died February 3, 1919. His body was brought to Virginia and buried in a cemetery in the vicinity of Newport News, and near the home of his parents. Each wife testifies to having attended the funeral.

As already observed, Sealey, from the time he married plaintiff in 1909 until some time in 1913, when he was ordered and transferred from the Hampton Roads district, resided in Portsmouth with plaintiff when ashore, and apparently regarded Virginia as his home. After he was ordered away from the Hampton Roads district, he continued to correspond with plaintiff and visited her in

Portsmouth when on leave from his vessel. A son was born of the marriage on September 25, 1915. Plaintiff testified that Sealey, after his transfer from this naval district, regularly contributed to her support.

While stationed at Philadelphia, Sealey met Amy Marie, the second wife. Impliedly at least, he held himself out to her as being unmarried and the meeting was rapidly followed by courtship and engagement to marry. Amy Marie Sealey, the second wife, testified that Sealey never mentioned or discussed with her his prior marriage and that she knew nothing of it until about three years ago, which was years after his death. He apparently had intended to divorce a wife in 1911, as appears from receipts given him by a Boston attorney named Noon, covering payments to said attorney for his fees and the cost of proposed divorce proceedings. So far as the evidence here discloses, no divorce was ever obtained and, in fact, no proceedings to that end were ever instituted, so that plaintiff remained Sealey's lawful wife until his death. As his widow she was first entitled, under the laws of Virginia, to qualify as administratrix of his estate, assuming that qualification thereon could be had in Virginia.

The evidence of the supposed marriage by Sealey to Amy Marie, the second wife, is disclosed by her testimony, in numerous letters written by him to her while he was in France, and by his having designated her as the beneficiary of his war risk insurance. In his letters to her he invariably addressed her as his wife or otherwise referred to her as occupying that status. Defendant testified that a daughter was born of this supposed marriage.

In describing their marriage, the second wife testified that it cost her and Sealey $50 to get married, because, as she expressed it, "he only had $45.00. I gave him $5.00, just a form we went through to satisfy me. What it was I could not tell but that is just what it cost, $50." In one of her letters to the Bureau, she said: "I tried two years ago to get the record of my marriage to Arthur Lee Sealey. They say there is none. When I asked Mr. Sealey about the marriage he said he had arranged it through an 'ad' in a newspaper." From her testimony it appears that, although both Sealey and said Amy Marie were living in Philadelphia at the time of their supposed marriage, he was not content to have the ceremony performed there, but, at his suggestion, the two journeyed to Freehold, N. J., some sixty miles away for that purpose. There an alleged ceremony was performed by a person who held himself out as a justice of peace. No certificate or any written evidence of this supposed marriage was ever secured by the "second wife." She seems to have intrusted all these matters to deceased, who, doubtless, in the dilemma of having two wives at one and the same time, and keeping each in ignorance of the existence of the other, discussed the subject as seldom, as briefly, and as vaguely as possible.

Sealey, as permitted by law, applied for and was granted two war risk insurance policies aggregating the sum of $10,000, designating Amy Marie Sealey, the second wife, as the sole beneficiary. Upon her application to the government following his death, she was held to be entitled to the insurance, and installments were regularly paid to her from February 4, 1919, to July 3, 1931, to the aggregate of $8,567.50. The Bureau, having for the first time learned of Sealey's prior marriage to plaintiff, Nellie V. Sealey, discontinued payments to defendant.

Plaintiff explains that her delay in making claim upon the government for the insurance was due to the fact that she did not know that Sealey had any insurance, until long after his death, that she first learned of that fact after she had made application to the Bureau for his bonus. The Bureau records tend to corroborate her in that testimony.

The government's mistake was caused by the act of the insured himself, in designating as beneficiary one who he must have known at the time was not his lawful wife, and, therefore not within the permitted class as prescribed by the statute (U. S. C., title 38, § 511 [38 USCA § 511]). The government in good faith acted upon that representation by Sealey without knowledge of its falsity, and it would seem patent that the beneficiary can take no higher position than the insured himself could have taken against the government. In other words, the government is entitled, under the circumstances, to credit for all payments heretofore made to the "second wife."

The government denied the existence of any disagreement between it and plaintiff, Nellie V. Sealey, but the court having heard the evidence, overruled that defense. Being a mere stakeholder of the remaining payments, the government now indicates its willingness to pay the remainder due and to become due under the policies to plaintiff as administratrix in order that the state court may proceed to hear and decide any conflicting claims thereto and order proper distribution thereof.

Although defendant, the "second wife," earnestly contends that deceased at the time of his death was a resident of and domiciled in Pennsylvania, so far as the evidence discloses, neither she nor any one else, has ever qualified or attempted to qualify as his personal representative in Pennsylvania.

Administration on Sealey's estate was granted to plaintiff by the clerk of the hustings court for the city of Portsmouth on April 5, 1932. Code Va. 1930, § 5249. The order recites that "administration on the estate of Arthur Lee Sealey, late of this City," etc., "is granted to Nellie V. Sealey."

 From the foregoing facts, I think it is clear that there is a signal failure on the part of defendant to show that the hustings court of Portsmouth was without jurisdiction to grant administration to plaintiff. On the contrary, I think there is a prima facie presumption that Sealey's domicile in Virginia continued after his enlistment in the navy and his transfers pursuant to orders to different stations outside Virginia.

"A domicile once existing continues until another is acquired. A person cannot be without a legal domicile somewhere. Where a change of domicile is alleged, the burden of proof rests upon the party making the allegation." Desmare v. United States, 93 U. S. 605, 610, 23 L. Ed. 959.

"Assuming the proposition that a member of the army may change his domicile, if not inconsistent with the military situation, to be one based upon reason, and established by the authorities, it still remains that the intention to change must be clear, and must be associated with something fixed and established as indicating such a purpose, and the circumstances in this case are against such an idea." Ex parte White (D. C.) 228 F. 88, 90.

In 9 R. C. L., at page 551, it is said: "*Soldiers and Sailors.*—The domicile of a person is in no way affected by his enlistment or acceptance of employment in the civil, military or naval service of his country. He does not thereby abandon or lose the domicile which he had when he entered the service, nor does he acquire one at the place where he serves. Accordingly, if one enters the military service and with his regiment goes beyond the limits of the state, remaining there for some time in such service, he does not become a nonresident of the state. And the soldier residing at a government post on land ceded by a state to the government, is not a resident of that state, although the grant by the state of the site of the post reserves the right to serve process from the courts of the state. If a soldier at the time of his admission as an inmate of a soldiers' home has a legal residence in a place other than that in which the home is situated, he does not necessarily lose such residence while an inmate, nor acquire a new residence in the home, unless it is his intention to abandon his former residence and remain permanently in the home. But if he abandons his former residence, and becomes an inmate of a soldiers' home, with an intention to make that his future place of residence, and remains with such intention, he thereby gains a residence where the home is situated. The same rule governs inmates of county infirmaries, and applies to government service in general." See, also, 19 C. J. 418 "Quasi Incapacity—1. Soldiers and Sailors"; Cooper's Adm'r v. Com., 121 Va. 338, 93 S. E. 680; Talley, Adm'r v. Com., 127 Va. 516, 103 S. E. 612; Com. v. Kernochan, 129 Va. 405, 106 S. E. 367, 30 A. L. R. 601.

That presumption is strengthened by the fact of his maintaining his home with plaintiff in Virginia for some years after their marriage, the fact that his father, mother, and the other members of his family lived in Virginia, the interment of his body in Virginia, which it may be assumed in the absence of any evidence to the contrary was in accordance with wishes expressed by him, and by his continuing to contribute to the support of plaintiff and their child after he was ordered away from Virginia by those in authority over him.

There is a lack of any substantial evidence that he left Virginia with the intention of permanently changing his domicile. His departure was in no sense a voluntary act on his part, but, so far as the evidence shows, resulted solely from the orders of those in authority over him. Wherever they ordered him to go, there he was compelled to go, whether or not it conformed to his own wishes. He was without choice in the matter. It would hardly appear necessary to add that the alleged marriage to defendant, under the circumstances narrated in her testimony, falls far short of showing that Sealey had become or ever intended to become a permanent resident of Pennsylvania.

It was earnestly contended by counsel for plaintiff that defendant was seeking to attack collaterally the order of the hustings court appointing plaintiff administratrix, and that such attack could only be made in a proceeding brought directly for that purpose. In view of what has been said herein, the court does not deem it necessary to decide that question.

438

The court concludes, therefore, that the hustings court for the city of Portsmouth had jurisdiction to enter the order of April 5, 1932, granting to plaintiff letters of administration on the estate of Arthur Lee Sealey, deceased, and that plaintiff is entitled to a judgment against the United States for such installments as now remain unpaid on the insurance.

All questions relating to the proper distribution of the sum or sums herein recovered are to be decided by the court which granted said letters of administration; that is to say, it is for the hustings court for the city of Portsmouth or another Virginia court having jurisdiction in such cases to determine to whom and in what amounts said recovery shall be distributed.

In order fully to protect the rights of all persons claiming to be interested in the fund, plaintiff will be required to give adequate security, as administratrix, for her faithful administration of said funds, before the government is required to pay over the same to her in this proceeding. She can no doubt arrange for a corporate surety bond to that end, by agreeing with her surety that all checks by her as administratrix upon the fund shall be countersigned by a representative of the surety, or by other arrangements satisfactory to her surety.

An order and judgment in conformity herewith will be entered when presented.