"Edith Lamont", as Committee of the Person of "Babette Couteau", Petitioner, v. "Roberta Couteau", as Legally Adopted Daughter, Respondent.*

Domestic Relations Court of the City of New York, Family Court Division, New York County, February 6, 1948.

---

* The opinion as filed sets forth the true names of all parties but as here published substitutes fictitious names and disguises certain other details, in consonance with the spirit of section 52 of the New York City Domestic Relations Court Act.

" *Edith Lamont* ", as committee of the person of " Babette Couteau ", petitioner in person.

" *Roberta Couteau* ", respondent in person.

SICHER, J. " Indigent parents of advanced years are ordinarily cared for within the family group. A ' poor relative ' proceeding in this Court is almost always symptomatic of atypical conditions * * *." (*Neuerstein* v. *Newburger*, 53 N. Y. S. 2d 906, 908, 909.) Thus, the instant proceeding stems from deep hostility between the incompetent's sister, in her capacity as committee of the person, and the incompetent's legally adopted daughter.

The facts are unusual and involve questions of law.

On May 7, 1934, the Supreme Court of the State of New York, Kings County, appointed X Trust Company as committee of the property, and a sister, " Edith Lamont ", as committee of the person, of the above-named " Babette Couteau " (petitioner herein), a duly adjudicated incompetent. (Civ. Prac. Act, art. 81.)

Previously, on June 6, 1919, upon petition of said " Babette Couteau " and her husband, " Andre Couteau ", since deceased, the Surrogate's Court, Kings County, had duly confirmed the

adoption of the above-named "Roberta Couteau" (respondent herein) by said "Andre Couteau" and "Babette Couteau" as her foster parents and adjudged that she should thereafter "be regarded and treated in all respects as the child of the said 'Andre Couteau' and 'Babette Couteau', foster parents, with all the rights and privileges conferred by law."

That order of adoption was entered pursuant to then sections 113 and 114 of Domestic Relations Law (as amd. by L. 1915, ch. 352 and L. 1916, ch. 453), which provided, *inter alia,* analogously to present sections 114 and 115 of Domestic Relations Law, that "Thereafter the parents of the person adopted are relieved from all parental duties toward, and of all responsibility for, and have no rights over such child, or to his property by descent or succession * * *. The foster parent or parents and the person adopted sustain toward each other the legal relation of parent and child, and have all the rights *and are subject to all the duties of that relation,* including the right of inheritance from each other, except [next follow certain provisions here immaterial]." (Italics supplied.)

On July 25, 1947, X Trust Company filed in the Supreme Court of the State of New York, Kings County, an account of its acts and proceedings as committee of the property of said "Babette Couteau" for the period from the date of its appointment to May 15, 1947, inclusive; and on September 29, 1947, decision was rendered that the account be approved as filed, that said "Roberta Couteau's" claim to certain jewelry referred to in the account be allowed; that the balance remaining in the estate, after payment of commissions and the expenses and allowances in the accounting proceeding, be paid to the committee of the person at the rate of $20 a week for application to the incompetent's maintenance, and that, when the estate will have been so exhausted, a final order be entered discharging the committee of the property.

Such final order was entered on October 20, 1947.

From said account, the report of the special guardian of the incompetent in that accounting proceeding, and said October 20, 1947, final order, and from the testimony of said "Edith Lamont" and said "Roberta Couteau" at the December 4, 1947, hearing before me, it appears that said "Babette Couteau" is a widow, now seventy-six years of age; that about March 30, 1935, she was placed by the committee of her person in the private nursing home of "Martha Duncan", in Y— Town, New Jersey, and has continuously since been confined there; that her sister is, and since her appointment as commit-

tee of the person has been, a resident of Kings County; that said incompetent likewise was domiciled in Kings County at the time of the adjudication and was then a senile dementia patient in a Long Island private sanitarium; that the assets collected by the committee of the property totaled $41,667.39; that such committee disbursed for the incompetent's support and maintenance, at first at the rate of $100 a week; then, from August 17, 1934, to June 28, 1935, $50 a week; from July 5, 1935, to January 10, 1936, $70 a week; from January 17, 1936, to May 26, 1939, $60 a week; from June 2, 1939, to January 30, 1942, $50 a week; from February 6, 1942, to July 24, 1942, $45 a week; from August 7, 1942, to May 26, 1944, $40 a week; from June 2, 1944, to April 25, 1947, $30 a week; and, for the remaining period up to the October 20, 1947, discharge of the committee of the property, a total of only $283.43; also, that between June 8, 1934, and June 6, 1935, there were paid toward the support and maintenance of said " Roberta Couteau " $15 a week and from June 13, 1935, until June 2, 1936, $20 a week; and that in allowance of her claim therefor in the final accounting proceeding there was delivered to her jewelry of the inventory value of $260.

Now that the once ample assets of the incompetent's estate are exhausted, she can be cared for still in a private nursing home only if funds are forthcoming from other sources; otherwise, she must be transferred to a hospital for the mentally ill maintained by the State of New York and thereupon become a public charge.

It is intimated that " Martha Duncan " would continue to care for her at a cost of $30 a week, and that the incompetent's two sisters (said " Edith Lamont " and another sister residing in Chicago, Illinois) would each contribute $10 a week if respondent donate a like sum.

Efforts to effectuate an out-of-court arrangement have failed, because of respondent's assertion of financial inability and the manifest antagonism between her and said " Edith Lamont ". The latter distrusts the former and resents her successful claim to certain jewelry in the final accounting proceeding; respondent, in turn, feels aggrieved at the exhaustion of the incompetent's estate by what she regards as too lavish past payments for the incompetent's care; also, she is embittered by " Edith Lamont's " having launched abortive steps to cause abrogation of the adoption during respondent's minority and needling the foster mother since the onset of senile dementia to revile respondent.

Consequently, it is necessary to make formal disposition within the narrow legal limitations and the restricted jurisdiction of this statutory court.

At common law no duty rests even upon a legitimate child to support his flesh-and-blood parent. (*Ulrich* v. *Ulrich*, 136 N. Y. 120, 123; *Edwards* v. *Davis*, 16 Johns. 281, 285; *Herendeen* v. *De Witt*, 49 Hun 53, 54, 55; *Harrigan* v. *Cahill*, 100 Misc. 48, 50; *Matter of Salm*, 171 Misc. 367, affd. 258 App. Div. 875.) '' By the law of nature a man was bound to take care of his own father and mother; but there being no temporal obligation to enforce the law of nature, it was found necessary to establish it by Act of Parliament ''. (*Rex* v. *Munden*, 1 Strange 190; 93 Eng. Rep. 465.) '' The liability of a child to support its parents, who are infirm, destitute, or aged, was created in England and here by statute. The statute in that respect created duties unknown to the common law.'' (*Ulrich* v. *Ulrich, supra,* p. 123.) Nor may such liability, being wholly statutory, be extended beyond the terms of the particular statute creating it. (*Edwards* v. *Davis, supra*; *Herendeen* v. *De Witt, supra*; *Harrigan* v. *Cahill, supra*; 48 C. J., Paupers, § 180, p. 511.)

Accordingly, it is within the power of this court to make an order for the support of the seventy-six years old petitioner only within the scope of the legislative grant of powers to the Family Court Division of this court, namely:

'' To require of persons legally chargeable with the support of a * * * poor relative and who are possessed of sufficient means or who are able to earn such means, the payment weekly, or at other fixed periods, of a fair and reasonable sum for such support, or as a contribution towards such support, according to the means of the persons so chargeable; provided, however, that the amount that the court may require a respondent to pay for the support of the petitioner shall not exceed fifty dollars a week.'' (N. Y. City Dom. Rel. Ct. Act, § 92, subd. [3].)

'' To require the support by those legally chargeable therewith of a dependent adult who is unable to maintain himself and is likely to become a public charge; the court to determine and apportion the fair and reasonable sum that each such relative shall be required to contribute, as may be just and appropriate in view of the needs of the petitioner and the other circumstances of the case.'' (N. Y. City Dom. Rel. Ct. Act, § 92, subd. [9].)

'' The parents, the grandparents and the children of a dependent person over seventeen years of age, who has been a resident of the city at any time during the twelve months preceding the

filing of the petition for his support, and who is unable to maintain himself and is likely to become a public charge are hereby declared to be severally chargeable with the support of such poor relative. The court shall determine and apportion the fair and reasonable sum that each such person shall be required to contribute, as may be just and appropriate in view of the needs of the petitioner and the other circumstances of the case and their respective means." (N. Y. City Dom. Rel. Ct. Act, § 101, subd. 4.)

" *Presumptions.* * * * In any such hearing or trial * * * a respondent shall, prima facie, be presumed to have sufficient means to support his * * * parent *. * *, and a dependent adult without means to maintain himself shall be presumed to be likely to become a public charge." (N. Y. City Dom. Rel. Ct. Act, § 131.)

" *Residential jurisdiction.* * * · * A * * * child * * * of a dependent person over seventeen years of age · who shall have been a resident of the city at any time during the twelve months preceding the filing of the petition for his support may be required to furnish support * * * if, (a) such * * * child * * * is residing or domiciled in the city at the time of the filing of the petition for support * * *." (N. Y. City Dom. Rel. Ct. Act, § 103, subd. 3, par. [a].)

It should be noted that residence of petitioner within the city of New York, inability to support herself, and her being or likely to become a public charge are all jurisdictional prerequisites. (See *Anonymous* v. *Anonymous,* 176 Misc. 103.)

There can be no doubt that petitioner " Babette Couteau " is unable to maintain herself and, in the light of the facts above set forth, is now likely to become a public charge.

It seems indisputable also that she is still a resident of the · city of New York, where she was adjudicated an incompetent person, committees of her property and person were appointed, and the committee of her person has always resided. Only a person *sui juris* may choose and change his domicile. Thus, an infant cannot (*Matter of Thorne,* 240 N. Y. 444); similarly, " an adjudged incompetent person, being incapable of intelligent action, has no power by his own will or act to change his State or national domicile from that which existed at the time he became incompetent since he lacks the mental capacity of exercising either choice or intention — twin elements generally regarded as essential to a change of domicile. (*Chew* v. *Nicholson,* 281 F. 400; *Matter of Curtiss,* 199 N. Y. 36; *Matter of*

*Horton,* 175 App. Div. 447; *Matter of Porter,* 34 App. Div. 147.)
The committee of the incompetent has no power to change the
domicile of its ward. (*Chew* v. *Nicholson, supra*; *Matter of
Curtiss, supra*; *Matter of Horton, supra*; *Matter of Porter,
supra.*) " (*Matter of Viscomi* [*Crowley*], 183 Misc. 374, 379.
Cf. *Matter of Kassler,* 173 Misc. 856; see 28 C. J. S., Domicile,
§ 12, subd. e, p. 27.)

Respondent herself, being a resident of New York City, meets
the residential requirements of a " poor relative " proceeding
respondent. (N. Y. City Dom. Rel. Ct. Act, § 103, subd. 3,
par. [a].)

And for the reasons below stated, she is hereby held also to
come within the statutory category of " children of a dependent
person ".

However, she is the only person legally chargeable with peti-
tioner's support in this proceeding. Petitioner is otherwise
childless; obviously, there are no living parents or grandparents;
and the statute governing " poor relative " proceedings in this
court, unlike those in other States (for example, Illinois),
does not include sisters among the legally chargeable relatives.

Personal research has turned up no reported decision squarely
holding that an adopted child is so chargeable. (Cf. *Parshall* v.
*Parshall,* 56 Cal. App. 553, and cases cited; *Scott* v. *Scott,* 247
F. 976.)

But the reasoning in *Betz* v. *Horr* (276 N. Y. 83) sustains,
and indeed constrains, the conclusion that the words " children
of a dependent person " in subdivision 4 of section 101 of the
New York City Domestic Relations Court Act include a legally
adopted child as well as any legitimate child of the dependent
parent's body.

*Betz* v. *Horr* (*supra*) dealt with the converse situation of a
proceeding under subdivision 4 of section 101 of the Domestic
Relations Court Act, and correlated sections, to require the
natural father of a destitute adult daughter to contribute a
stated weekly sum towards her support, notwithstanding that
she had previously been legally adopted by her maternal grand-
parents by order of a court of competent jurisdiction. The New
York Court of Appeals vacated the support order entered below,
holding that the effect of the adoption had been to relieve the
natural parents " from all paternal duties toward, and of all
responsibility for * * * such a child "; that " The intent
and purpose of the legislative commands must be found from
the statutes relating to the same general subject-matter taken as

a whole. (*Seligman* v. *Friedlander,* 199 N. Y. 373.) The same words cannot mean one thing in the Domestic Relations Law and have an entirely different meaning in * * * the Domestic Relations Court Act of New York City * * * unless such an intent on the part of the Legislature is clearly expressed. The Legislature has expressed no such intent." (*Betz* v. *Horr, supra,* p. 88.)

As above shown, the statute under which respondent " Roberta Couteau " was legally adopted by petitioner " Babette Couteau " and her late husband expressly provides that " the foster parent or parents and the person adopted sustain towards each other the legal relation of parent and child, and have all the rights and *are subject to all the duties of that relation.*"

Moreover, the whole tenor of the statutory adoption procedure in this State has been to make the adopted child the natural child of the adoptive parent (*Carpenter* v. *Buffalo Gen. El. Co.,* 213 N. Y. 101, 108), to give the adopted child the same legal relation to the foster parent as a child of his body. (*Matter of Cook,* 187 N. Y. 253, 260.)

Such purpose and effect of the New York legislation with regard to adopted children in contrast with the still limited and inferior status of children born out of wedlock distinguish the instant case from the construction of subdivision 4 of section 101 of the Domestic Relations Court Act as not charging an illegitimate child for the support of either parent. (See " *Castellani* " v. " *Castellani* ", 176 Misc. 763, 764, affd. *sub nom. Capaldo* v. *Capaldo,* 263 App. Div. 984.)

It remains only to determine the amount which respondent may fairly be required to contribute toward petitioner's support under all the particular circumstances.

Despite their intense mutual hostility both respondent and the committee of petitioner's person profess to abhor her being transferred to a State hospital for the mentally ill. However, it is patently not within respondent's financial ability to assume the whole, or even a fully ratable share, of the cost of continuing to maintain petitioner in the private nursing home where she has been confined since March 30, 1935, and where it may be desirable for her to remain until death. Apart from the aforementioned nominal value jewelry respondent has no proved assets; she is dependent on her own earnings; and her earning capacity is impaired by occasional after effects of infantile paralysis. But she was well educated by her foster parents; and between October 18, 1947, and January 24, 1948, she had net

earnings of $758.90, i.e., an average of $54.20 per week of that period, which, however, respondent testifies to be seasonal, claiming an all-the-year-round net of less than $40 a week. Nevertheless, on the basis of her potential earning capacity reflected in such recent earnings and the above-quoted presumption under section 131 of the Domestic Relations Court Act, she is adjudged presently able to contribute at least the approximate biblical tithe of $5 a week to her destitute foster mother's support.

It is hoped that petitioner's two sisters will voluntarily furnish any needed difference.

When and if petitioner be removed to a State hospital, today's order may be suspended, without prejudice, however, to such rights as may then be asserted by the Commissioner of Mental Hygiene under the Mental Hygiene Law of New York.

For the foregoing reasons, the court hereby finds that respondent is chargeable with support as alleged in the petition; and she is therefore hereby ordered and directed to pay into this court the weekly sum of $5, beginning on February 16, 1948, each and every week, for support of petitioner " Babette Couteau ", until further order of the court, and the support bureau is hereby authorized and directed to transmit the amount of each such deposit to " Edith Lamont ", as committee of the person of said " Babette Couteau."

Family Court rule II requires all such deposits to be in cash or by money order or certified check to the order of the court. (Bender's Court Rules [1st ed.], p. 364.) Moreover, if it be more convenient for respondent to remit larger lump amounts, instead of those weekly sums, she is permitted to do so, provided that each deposit at all times at least equals the amount which shall have accrued under this weekly order at the time of the respective remittance. Any excess deposit shall be received and held by the cashier in escrow, for that purpose, and paid out against the current order only when and as each weekly installment accrue thereunder, and in the event of the death of petitioner or of respondent, any such excess deposited shall be returnable accordingly as of the date of death.

Notice shall be given to the parties pursuant to the subjoined direction.