In the Matter of the General Guardianship of the Property and Estate of PETER ALFRED CONSTANTIN MARIA SALM, an Infant.

Supreme Court, Special Term, New York County, May 25, 1939.

*Herman B. Goodstein*, for the petitioner.

*John Caldwell Myers* [*Thomas D. Thacher* of counsel], for the respondents Millicent Rogers Balcom and John Caldwell Myers.

COLLINS, J. Ludwig Constantin Salm, an alien non-resident, pleading penury, applies for allowances out of the abundant estate of his fourteen-and-a-half-year old son, Peter Alfred Constantin Maria Salm, for whose property and estate this court appointed the infant's mother, Millicent Rogers Balcom, and John Caldwell Myers, Esq., general guardians, on October 7, 1935.

More specifically, the petition seeks (a) payment to the father out of his son's estate of an annual allowance of $20,000 for the

support of the father until his alleged financial condition should no longer require such relief; (b) payment to the father out of the estate of his son of an annual allowance of $10,000 to defray the father's expenses in availing himself of visitorial and custodial rights under a judicial decree and an agreement between the son's parents, and (c) payment to the father's attorney out of the infant's estate of $35,000 for legal services rendered and disbursements of $1,656.24 incurred in the alleged protection of the son's property rights.

The general guardians resist the appeal for this largess primarily because of the asserted absence of legal warrant therefor.

The infant's parents were married January 8, 1924, and their son was born September 27, 1924, after the parents had separated. The marriage was dissolved in France April 11, 1927, the decree embodying the provisions of an agreement between the parties, dated February 22, 1927, concerning the division of the son's custody as well as his education and maintenance.

The agreement awards the son's custody to the father approximately twenty-five per cent of the time. The father has not, however, availed himself of all his custodial rights, but, he avows, he is now animated by a desire " to see him and visit with him as much as it is permissible." He desires, furthermore, that his seventy-five-year old mother visit her grandchild, as contemplated by the custodial agreement.

The son has attended school abroad but he is attaining the age when, in harmony with the custodial agreement, his education will be continued in the United States.

The father has never remarried. The mother, however, has remarried twice. At no time has the father contributed to his son's support, except on such occasions when the son visited the father, " during which time "— so the custodial agreement provides — the father is required to " furnish suitable quarters and maintenance for the child and his nurse or tutor."

That the son possesses a considerable estate from which a large income issues is indubitable. The petition asserts that the son owns through his general guardians " an outright principal estate worth upwards of One Million five hundred thousand ($1,500,000.00) Dollars, consisting of cash and/or marketable securities." In addition thereto, so alleges the father, his son is the life beneficiary of a trust fund having a principal worth of upwards of $1,750,000. Thus, summarizes the father, his son is in receipt through his guardians and there is being accumulated for him until he arrives at his majority, the income upon upwards of $3,250,000, less tax charges thereon, and personal maintenance expenses.

None of this capital or income, however, derives from the son's father. The fortune came to the son under the last will and testament of his maternal grandfather, Col. Henry H. Rogers, who died on July 25, 1935. Thus, the father solicits a bounty from a source towards which he contributed nothing.

It is contended that the counsel fees for which payment is now sought from the son's estate were incurred by the father in connection with the son's interest in his grandfather's estate.

The father is now fifty-three years old and resides in France, having recently removed from Austria where he was born and resided most of his life. He is of noble birth — a count. His social position is in the upper stratum. He has been tennis champion of Austria, and has occupied a high military status. He predicates this demand for a liberal bestowment on necessity, claiming to have sustained severe financial reverses as a result of political upheavals in Austria. These financial reverses, he declares, have deprived him of capital resources as well as of the means of earning an income. Having no property of realizable value, nor of income, he has, he alleges, been borrowing from friends for immediate necessary day-to-day expenses. He affirms that due to age, limited commercial training and present economic conditions in Austria, he is unable to secure remunerative employment. He has no profession. It does not appear that necessity or inclination has prepared him for his present plight; he has not been inspired to pursue regular gainful occupation or engage regularly in business; although he has, it seems, engaged " in several business enterprises which proved unsuccessful and involved loss of capital." " Upon the advent of the Nazi domination in Austria, firms and persons who were indebted to " him " became unable to pay the same and " his " income thereupon ceased and principal amounts became worthless." " Political considerations made it advisable for " him to leave the country of his birth. His mother, too, " who had enjoyed substantial property and income has suffered disastrously as a result of said political upheavals."

The basis of the plea appears in paragraph 14 of the petition: " I have been informed by counsel and verily believe that it is the duty of a child possessing great wealth to support or contribute to the support of a parent without funds or income; and I am confident that my son would wish to observe his obligation if he fully understood my circumstances and were permitted to make independent disposition of his estate. I have also been advised by counsel and verily believe that I am entitled to an allowance for expenses in maintaining and visiting with Peter during the times of his minority when I am entitled to his custody. It has now

become necessary, due to circumstances suddenly arising and beyond my control, to petition this Court for such relief."

Does this plea find sustenance in the law?

It is ancient doctrine that a parent is under a natural obligation to furnish necessaries for his infant children and if he neglects such duty any other person who supplies such necessaries is deemed to have conferred a benefit on the delinquent parent for which the law raises an implied promise to pay on the part of the parent. (*Laumeier* v. *Laumeier*, 237 N. Y. 357; *De Brauwere* v. *De Brauwere*, 203 id. 460; *Michaels* v. *Flach*, 197 App. Div. 478; *Haskell* v. *Haskell*, 201 id. 414.)

This application, in effect, essays a reversal of that doctrine. Here the father seeks support from his infant son. Does the law permit one who has furnished necessaries for the support of indigent parents to recover therefor from a more fortunate child? The question is not new. It arose in this State as early as 1819 and was answered in *Edwards* v. *Davis* (16 Johns. 281) thus: "No one who has afforded relief to indigent persons from motives of humanity, or from other consideration, can maintain a suit, as upon an implied contract, against the children of such parents, arising merely from the duty which such child owes to its parents, to support them."

The *Edwards* case was cited with approval many years later (1888) in *Herendeen* v. *De Witt* (49 Hun, 53), where a son was sued on a note given to a county asylum for his father's support. Upholding a defense of non-liability, the court said: "At common law no legal duty or liability rests upon a child to support his indigent parent, and the means by which he may be charged *in invitum* are wholly statutory."

Still later (1917), in *Harrigan* v. *Cahill* (100 Misc. 48), the issue was whether a son could recover from his stepfather for necessaries supplied to his mother — the defendant's wife. The defendant stepfather maintained that the son "was obliged to support his mother to the same extent that defendant was liable to support her as his wife." Discarding this contention, the court appositely wrote: "The liability of a child to support the parent in this State is not the same as that of the husband to support his wife. This liability of the child comes solely by statute and only after proceedings have been taken under it. Concededly a natural obligation exists but it is only enforceable through the statute and in cases for which it provides. It never existed in this State as a common law duty but came into existence at an early date to protect the public and to save the parent from suffering. Originally this statutory liability was provided for in the Revised Statutes

but now it is found in the Code of Criminal Procedure. (*Herendeen* v. *De Witt*, 49 Hun, 53; *Edwards* v. *Davis*, 16 Johns. 281; *Ulrich* v. *Ulrich*, 136 N. Y. 120.) The moral or natural obligation on the part of the plaintiff to support his mother is not sufficient to make him liable as upon the promise to pay. Our law does not go to the length of the civil law in enforcing a naked promise or a mere moral obligation (*Thorne* v. *Deas*, 4 Johns. 97), although if a person is morally bound to pay a debt, though not legally bound, a subsequent promise to pay may give a right of action. (*Lee* v. *Muggeridge*, 5 Taunt. 36, 44.) "

The same rule is set forth in Corpus Juris (Vol. 46, p. 1279, § 73).

Section 125 of the Public Welfare Law and section 914 of the Code of Criminal Procedure provide that when a parent is a recipient of public relief or is liable to become a public charge, a child may be compelled to contribute to the indigent parent's support. The remedy afforded by these provisions, however, is for the benefit of the community sustaining the burden of the parent's support; only public officials can enforce the remedy. The father here scorns these provisions, and insists that they have no application. His appeal is addressed to equity. He entreats the *sympathies* of the law; it is the law's *conscience* he seeks to move. True enough, the father is invoking equity. There is, nevertheless, a legal barrier to be hurdled. We are dealing with a ward's funds. Expenditures therefrom are restricted to those purposes recognized as proper and lawful. The court cannot grant alms from an infant's estate; it has no power to immolate. As much as the beseechment might command the court's sympathies, if it has no foundation in the law, it must be rejected.

There is a paucity of cases on the subject, but the rigidity of the rule has been nigh inexorable. The few cases apparently in conflict can hardly be accepted as patterns for the father's position.

Thus, in *Matter of Connolly* (88 Misc. 405) an infant's resources were drawn upon to save its parent from a pauper's burial. In *Matter of Neville* (147 Misc. 171) the infant was eighteen years old and consented to the contribution. In *Matter of Kessler* (153 Misc. 753) an application to compel contribution from an infant's estate to pay the parent's burial expenses was denied, inasmuch as there were adult children who could afford to pay. In these cases an able child was forced to bear a burden which otherwise would have to be borne by the community.

The nearest approach to this case is *Matter of Vanderbilt* (153 Misc. 884), but even that case is no exact precedent for the relief here urged. The *Vanderbilt* matter was not primarily an appli-

cation by the mother for maintenance from the infant's estate. Rather, it was an application by her to be appointed the guardian of the person of her daughter and to be appointed general guardian of the property. The incident of an allowance to the mother does not even appear in the headnotes of the reported decision. Evidently, the general guardians there did not object to the mother's request for support from the infant's estate. Conferences were held by the surrogate " in order to reach an amicable settlement of all the issues in the proceeding. An adjustment of the differences was reached * * * which was acceptable to all the parties involved. There remained only the drafting of a decree, simple in form, to be submitted to the surrogate for signature." But the settlement was not consummated and the decree was not submitted (p. 885). The court then proceeded to dispose of the issues and to outline the terms of the decree. Apparently the power of the surrogate to compel maintenance of the mother by the infant was not challenged. Hence, " a reasonable allowance * * * out of the infant's property for the support of the infant's mother if the latter be without other means of livelihood " was countenanced. But all expenditures of the infant's funds were to be made by the guardians. Allowances to the mother came out of the allowances by the guardians for the maintenance of the infant. " Since the Surrogate's Court has appointed the guardians of the property, their duties should be supervised and the expenditure of the funds controlled exclusively by the orders of this court " (p. 890).

In the present proceeding, however, not only is the application not made by the guardians (one of them the infant's mother), but they stoutly oppose the granting of it. More than that, the father here is not asking that the guardians contribute what *they* consider necessary to the father's maintenance. What is sought is to wrest control from the guardians over a certain portion of the infant's estate and intrust it to the father — a person not accountable to the son, to the guardians or to the court.

In an earlier decision (*Matter of Vanderbilt*, 129 Misc. 605; affd., 220 App. Div. 830) Surrogate FOLEY denied an application by the general guardian to withdraw from the infant's estate a sum sufficient to pay premiums on policies of life insurance issued to the infant's mother for the benefit of the infant. At page 607 Surrogate FOLEY held: " By the established rules of equity, it is not within the power of the surrogate, or even of a judge possessing the widest chancery powers, to permit the impounding of the infant's funds, so as to deprive the infant of her right to absolute enjoyment of her estate at majority." The payment of insurance premiums

would have constituted an investment for the benefit and protection of the child, and the application therefor came from the guardian. Yet the court denied its power to order the infant's funds to be employed for that purpose. Here, however, no investment is sought, but rather out-and-out gratuities. Scraped of all camouflage this is an attempt by the father to be " declared in " on his son's estate. Authority therefor should be clear and compelling.

No pretense is made that the infant's allowance is not sufficient to enable him to visit his father, if the son wishes to do so. If the allowance is insufficient for that purpose, the responsibility of moving for its enlargement is on the guardians.

Significantly enough, the son who — it bears repeating — is fourteen and one-half years old, not only does not join in this application, but his own voice is not raised in the proceeding. " If the infant be over fourteen then it should join in the application of the guardian and also verify the same." (2 Jessup & Redfield's Law and Practice in the Surrogate's Court [3d ed.], § 1049, p. 2197.)

Again, to grant this request would do violence to the terms of the custodial agreement (to which the objecting mother is a party) because thereunder the father, not the son, must defray the expense entailed in availing himself of the privilege of his son's custody.

The father asserts that " there exists a mutuality of love and devotion between the petitioner and his infant son, which requires a holding that the latter would be naturally disposed by dictate of impulse alone, to grant financial aid " to the father. But neither the son, the mother nor the coguardian echo this sentiment.

If the guardians deem that the welfare of the infant justifies an expenditure of his funds to visit his father, the guardians can be depended upon to take appropriate steps in that direction. But it is not necessary to subsidize the father to bring father and son together. It is not even pretended that the son is pining for his father, or that the guardians are doing or would do anything to frustrate the son's natural impulse towards his father, or in violation of the intent or spirit of the custodial agreement.

Even if a canvass of the authorities yielded a precise precedent for this application, no *facts* are presented which would enable the court to fix an amount necessary for the father's maintenance. There are allegations, but no *proof* that the father is " without other means of livelihood." (*Matter of Vanderbilt, supra,* p. 890.) There is no proof of indigence or necessity. There is no foundation for a fixation. No criteria are presented; no gauge offered; no formula submitted for measuring the father's needs or satisfying his necessities.

By this application the father seeks to shift from the guardians to himself some of the duties and responsibilities devolving upon

the latter. Lump sum awards are not countenanced. They run counter to the whole elaborate scheme devised for the protection of an infant's estate. (*Matter of Plumb*, 52 Hun, 119; Surr. Ct. Act, § 194.) Who is to decide what is a necessity and what a luxury? Who will audit the expenditures? Who is to determine when the exigencies have ended? Not only is the legality of the supplication dubious, but its practicability as well.

My conclusion is that there is no authority in law or foundation in equity for granting the father's application for maintenance from his son's estate.

What has been written above applies with like reasoning and force to the remainder of the petition.

The legal services for which payment is asked were rendered in proceedings which resulted in the appointment of the general guardians, in the proceedings instituted by the father for the removal of the mother as a coguardian, and in proceedings in Suffolk county involving the construction of Colonel Rogers' will.

Admittedly, the primary obligation to pay for these services rested on the father. Admittedly, too, at the time the obligation was incurred the father was able to discharge it. I am unable to perceive why this obligation should now be shifted from the father to the son. There was no contractual relation, express or implied, between the father's attorney and the guardians or any other person authorized to bind the infant's estate. The son's interests were being safeguarded; there was no danger or threat to those interests. The father gratuitously injected himself as his son's champion when championship was unnecessary. There is no basis in law or morals for charging the son's estate with the consequences. It appears that the litigations did not inure to the son's benefit. The father had no right to bind his son's estate to pay an attorney's fee in connection with the guardianship proceeding. (*Stuppel* v. *Rabinowitz*, 195 App. Div. 498, 501; 2 Jessup & Redfield's Law and Practice in Surrogate's Court [3d ed.], § 1049, p. 2197.) Nor is there any legal basis for the payment out of the son's estate of counsel fees in connection with the removal proceedings or the proceedings in Suffolk county. Certainly the surrogate could not order such payment out of the infant's estate. (Surr. Ct. Act, § 278; *Matter of Winburn*, 160 Misc. 49; *Matter of Bloomingdale*, 169 id. 968; *Matter of Lyons*, 160 id. 429; *Matter of Curley*, 161 id. 391; *Matter of Frame*, 162 id. 34.)

A pertinent inquiry is " whether or not the estate has been benefited so as to warrant awarding estate funds to the attorney." (See the excellent contributed article and collated cases by Joseph Rasch, Esq., N. Y. L. J. May 11, 1939, p. 2166.)

The father, however, does not claim payment by virtue of the Surrogate's Court Act, but on the projected principle that he is without funds through conditions beyond his control and that he needs and requests of his son's funds to pay a debt which he owes and which he incurred for the benefit of the infant before he met with financial reverses and when he thought he could pay it. Thus, this debt of the father is governed by any other debt which he owes. If the son's funds can be utilized to discharge this debt, they can be employed to pay almost any debt of the father. As observed, the fundamental obstacle is that we are dealing with an infant's property which the courts must preserve and safeguard. Payment of the father's obligations (such as these) from the son's estate is not authorized.

It follows that the petition must be and it is in all respects denied.